500 So.2d 679 (1987)
Norma WONS, Appellant,
v.
The PUBLIC HEALTH TRUST OF DADE COUNTY, Florida, Appellee.
No. 86-985.
District Court of Appeal of Florida, Third District.
January 6, 1987.
*680 Kelner & Kelner and John Kelner, for appellant.
Robert A. Ginsburg, Co. Atty., and Aurora Ares, Asst. Co. Atty., for appellee.
Before SCHWARTZ, C.J., and HUBBART and BASKIN, JJ.
HUBBART, Judge.
This is an appeal by a hospital patient from a final order authorizing a public hospital to administer involuntary blood transfusions to the said patient over the latter's religious objections. As in St. Mary's Hospital v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985), we are confronted with the question of whether a competent adult has a lawful right to refuse a blood transfusion without which she may very well die. Because the state has no compelling interest under the circumstances of this case sufficient to override the patient's constitutional right (a) to practice her religion according to her conscience, and (b) to lead her private life free from unreasonable governmental inference, we reverse the order under review. We further certify that our decision herein passes upon a question, stated above, which is of "great public importance," so as to permit further review of this case by the Florida Supreme Court under Article V, Section 3(b)(4) of the Florida Constitution.

I
The facts of this case are these. On Sunday April 13, 1986, the Public Health Trust of Dade County, Florida, an agency and instrumentality of Dade County, Florida, which owns and operates Jackson Memorial Hospital [hereinafter "the Hospital"], filed an emergency petition with the Circuit Court for the Eleventh Judicial Circuit of Florida. In the petition, the Hospital sought (1) a court order authorizing its medical staff to administer allegedly lifesaving blood transfusions to Mrs. Norma Wons [hereinafter "Mrs. Wons"], an adult patient at the hospital, who for religious reasons had refused such transfusions, and (2) a court order appointing a guardian ad litem to advise the court on the issue presented on behalf of the patient. Circuit Judge Edmund Newbold, the emergency circuit judge on duty below, immediately appointed Mr. John Kelner, an attorney, to represent Mrs. Wons, and at 2:00 P.M. that day, April 13, 1986, conducted an emergency evidentiary hearing in chambers. Four witnesses testified at the hearing: Dr. Joseph M. Cevetta, the attending physician of the Hospital's intensive care unit; Henrich Wons, Mrs. Wons' husband; and Alberto and Nefdali Guadalupe, Mrs. Wons' two brothers. Also Henrich Wons, Jr., Mr. and Mrs. Wons' fourteen-year-old son appeared at the hearing, identified himself to the court, said he had a twelve-year-old brother, but did not testify under oath.
Based on the testimony adduced at the hearing, Judge Newbold made certain findings of fact in the order under review, to wit:
"1. That Norma Wons, a 38 year old woman, is a patient at Jackson Memorial Hospital in need of medical treatment and procedures including blood transfusions.
2. That Norma Wons and her family was informed as to the nature of and the necessity for emergency medical treatment and procedures, including blood transfusions.
3. That Norma Wons is a member of the Jehovah's Witness faith and has refused consent to the blood transfusion on the basis of her religious belief.
4. That Norma Wons was competent at the time she refused consent to the blood transfusion.
5. That the testimony heard by this Court shows that Norma Wons is suffering *681 from dysfunctional uterine bleeding and that delay in initiating a blood transfusion would threaten her life and that a blood transfusion would save her life.
6. That Norma Wons, a housewife, and her husband Henrich Wons, a carpenter, have two minor children ages twelve and fourteen, whose physical residence is with their parents and who are being reared by them."

A
These findings, we think, are based on substantial competent evidence. The testimony below plainly reveals that on Sunday April 13, 1986, Mrs. Wons was admitted to Jackson Memorial Hospital for a condition known as dysfunctional uterine bleeding. Dr. Joseph Cevetta, Director of the Intensive Care Unit at the hospital, examined Mrs. Wons, diagnosed her condition, and determined that she had lost over 90% of her available red blood cells. Mrs. Wons was suffering from extreme blood loss from her uterus, although the bleeding itself had stopped. Her bone marrow was producing red blood cells, but, in Dr. Cevetta's opinion, not in sufficient amount to replace those which she had already lost. In his view, Mrs. Wons was "absolutely at the edge, and at any instant or within hours she could die from lack of oxygen delivering capacity due to loss of red blood cells." (R. 17). He further stated that in the eighteen years he had been in charge of the Intensive Care Unit, he had "never taken care of a patient with a level as low as her hematocrit is at this point," (R. 17) that "[e]xperimentally in primates once a hematocrit falls below 10 percent, the oxygen delivery is insufficient, and once it falls below five percent death occurs," (R. 17-18) that Mrs. Wons' hematocrit level was at 3.5% and without an immediate blood transfusion "she will die." (R. 18).
Dr. Cevetta informed Mrs. Wons, a practicing Jehovah's Witness, of the seriousness of her medical condition and asked for permission to give her a blood transfusion. Although Mrs. Wons was drowsy and tired due to severe anemia, she was, in Dr. Cevetta's opinion, mentally competent to make a decision on this matter. Mrs. Wons' decision was "[n]o, I refuse based on my religious beliefs, the law of Jehovah, which says you will not accept a blood transfusion;" moreover, she added, "I will pull through." (R. 18) In Dr. Cevetta's opinion, Mrs. Wons wanted to live, which was a source of some concern to him, as he felt that she was hoping for an unwarranted miracle, rather than being resigned to die based on her religious convictions. "I think that she is denying the likelihood that she is at very serious risk of dying today" (R. 19), he said, and added "she is trusting that she will somehow miraculously pull through... ." (R. 23).
Mr. Henrich Wons, Mrs. Wons' husband, testified that he fully supported his wife's decision to refuse a blood transfusion. He stated that he, too, was a practicing Jehovah's Witness and if the decision were his, he would refuse a blood transfusion on his wife's behalf. He is a carpenter and an independent distributor of "natural products" (R. 25). In this capacity, he is the sole financial support for his family which consists of his wife and two minor children, ages twelve and fourteen. Mrs. Wons, it appears, had been in bed the past few weeks and during that time, her mother, a sixty-two-year-old woman in good health, had been caring for the children while Mr. Wons was at work. He testified that if his wife were to die, Mrs. Wons' mother and two brothers had agreed that they would assist in taking care of the children.
Alberto and Nefdali Guadalupe, Mrs. Wons' two brothers, were also fully supportive, in their testimony, of their sister's refusal to accept a blood transfusion. They too are practicing Jehovah's Witnesses and regard such transfusions to be a serious sin. Alberto Guadalupe stated:
"I have known my sister for many years when I lived in Pennsylvania, also in the State of Florida since 1972 when I moved here. She had this disease for a while, a long time ever since she had the second kid, and I have seen my sister pull through; and also she was hospitalized *682 before, and the doctor didn't want to take any responsibility, and she was released from the hospital, but up to this point they didn't take it to court.
The idea to say she will definitely die, that's just his opinion. There's no guarantee in there, you know. If she dies, she will die because that's her right as a patient, her right as a citizen of this country, and also her conviction of her belief of the Holy Scriptures as a principle.
We talk about principles. There's a lot of principles. Even in our coins it says `In God we trust.' Sometimes we put that trust aside. Now, we trust more in God. We are not asking for miracles. We are not going to say she's going to pull through.
Right away you say okay, take her out of the hospital, but she might make it, you see. She might. She might not. But it's her decision.
We personally as brothers, you know, me and my brother, we will not give any blood transfusions to her or any members of our family. We are convinced of that. Whatever decision is to be made she has to make the final decision. She made it in front of me, my wife, and in front of him. Strictly she said no blood transfusion. She will refuse until death if she has to."
Nefdali Guadalupe added:
"I sort of bring out the same point of view as my brother. I had the privilege to talk with the doctor earlier, and he gave me an idea of the critical point that she's at, but like I feel, and I know people feel  the body itself, the human body is a fantastic organism that even today scientists feel, are amazed at how it counteracts problems. She might be having an emergency, like she may come off it, but there's a slight margin. I cannot thoroughly agree with the doctor when he says she's going to definitely pass away. I'll not say that.
Adding reinforcement to what my brother said, through faith, it's based on facts that we know the Supreme Being, of God and heaven on earth, he created life, and one way or another the circumstances are there, and we are just putting things in his hands, and see what may become of this situation.
At this point we would like the Court to respect our opinion and, of course, strong belief that even if she did pass away we still have the day of resurrection, which we believe greatly also. Thank you."

B
At the conclusion of the testimony below, counsel for the Hospital urged the court to authorize the blood transfusions requested in the Hospital's petition; the basis for this request according to counsel, was "prong 2 of the Perlmutter decision, the need to protect innocent third parties." (R. 31). Counsel elaborated on this position as follows:
"We respect the family's religious beliefs, and we understand that they are very closely held beliefs. We feel the state has a compelling interest to have the children receive the benefit of their mother, her spiritual and moral guidance, and we would expect that this is a compelling state interest that would outweigh her constitutional right to refuse treatment in this case."
Mrs. Wons' guardian ad litem resisted the petition on the ground that under the established law, Mrs. Wons, as a competent adult, had a constitutional right to refuse the requested medical treatment based on reasons of religious conscience. He argued:
"You have heard from Jehovah Witnesses before. You know this lady is not doing this because she wants to commit suicide. It is her religious belief. If she was fully competent she would sit here and tell you that this is her wish, even if the possibility is or probability is that she will pass away. Under the law, the Court has no choice but to deny the petition."
Judge Newbold then ruled from the bench and authorized an immediate blood *683 transfusion for Mrs. Wons. His reasoning was as follows:
"I'm going to now take judicial notice of another fact which has not been expressed. I'll take judicial notice of the fact that, in my opinion, the two children here, one 12 and one 14, would be denied an intangible right they have to be reared by two loving parents, and not one, and I'll take judicial notice of the fact that for the most part the love and the parentage of two parents is far better than one, and that we would end up therefore with better citizens.
I recognize the law, and I know what the law says. You have a competent adult. She has refused to take blood, and she has a right to do so. The only way that we can obviate that right that's guaranteed to her by the privacy of the right of the Constitution of this state is to find an overriding interest, or overriding reason. I'm going to tell you straight out, and it may not be a popular decision, but I think that the right of these two children to be reared by two parents is an overriding reason."
Judge Newbold urged, nonetheless, an immediate appeal of his ruling to this court:
"I think you should still take it to the Third District. This is an overriding public interest. I think the public has a right. These people have a right. Their religion has a right. I do not underrate the power of faith or the power of faith. I can assure them of that.
But I think one does what one has to do, and today I have done what I think I have to do under the circumstances, because again, I'm taking judicial notice of the fact of these two young children, and the children are better off with two parents than one."
The above reasoning was later placed in the order under review in which Judge Newbold specifically found as a legal basis for his order:
"7. That Norma Wons' life-threatening nonconsent to a blood transfusion would deny her children the intangible right to be reared by two loving parents.
8. That the case of Satz v. Perlmutter, 362 So.2d 160 (Fla. 4th DCA 1978), affirmed with opinion, 379 So.2d 666 (Fla. 1980), identified four compelling state interests that could outweigh a person's privacy right to refuse life savings medical treatment; and that, among those interests, is the need to protect innocent third parties, i.e., minor children.
9. That the State, as parens patriae, in this case, has a sufficient compelling interest in protecting the minor children to override the right of Norma Wons to refuse life saving medical treatment."
Mrs. Wons appeals the final order authorizing the subject blood transfusions; the Hospital, in turn, resists this appeal.

C
We are informed that subsequent to the entry of the order appealed from and during pendency of this appeal, the Hospital personnel administered the required blood transfusions to Mrs. Wons pursuant to the trial court's order; that Mrs. Wons experienced a medical recovery from her grave, life-threatening condition; and that Mrs. Wons was thereafter discharged from the Hospital. She has since, pursuant to this court's order, filed an affidavit herein reflecting the above facts. She states:
"1. My name is Norma Wons and I have personal knowledge of the facts contained herein.
2. My religious beliefs are those of the Jehovah Witness.
3. I now suffer from a condition known as dysfunctional uterine bleeding. I have suffered from this condition for some time. Recently, the bleeding became excessive and I required hospitalization and was hospitalized at Jackson Memorial Hospital in Miami, Florida.
4. During my hospitalization, the doctors discussed with me the need for the administration of blood because of the blood loss that I was suffering. I discussed this with them and with my family. I advised them that I did not want to accept any blood or blood products (even *684 my own if it could be recovered) based on my religious teachings.
5. Despite my wishes, blood was administered to me from what I understand to be an order of a Judge.
6. I do not know how much blood I received.
7. I was discharged from the hospital two weeks ago.
8. I have been advised that the condition I suffer from  dysfunctional uterine bleeding  will not cure itself and I may need blood in the future to avoid passing away.
9. It is my wish and desire, based on my religious beliefs, that under those circumstances that blood not be administered to me and that I be permitted to heal or pass away with the aid of God."
All agree that in view of this affidavit and the grave importance of the issue presented, the instant appeal is not rendered moot by the administration of the blood transfusion to Mrs. Wons. Plainly, this is a recurring issue of enormous importance which otherwise evades ordinary appellate review. Moreover, Mrs. Wons still has the medical condition which may well require blood transfusions in the future.

II
Mrs. Wons urges on appeal that she has a constitutional right to refuse medical treatment in the form of a blood transfusion based on the authority of St. Mary's Hospital v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985). The Hospital, in turn, contends, as it argued below, that the state's interest in protecting the welfare of innocent third parties, to wit: Mrs. Wons' two minor children, overrides Mrs. Wons' right to refuse a lifesaving blood transfusion. In order to evaluate the merits of these respective legal positions, we turn to the applicable law on the asserted right of a person to refuse medical treatment in a life-threatening situation.

A
The leading case in Florida on the right of a person to refuse medical treatment allegedly necessary to sustain life is Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980), aff'g, 362 So.2d 160 (Fla. 4th DCA 1978). The Florida Supreme Court in Perlmutter articulated its holding as follows:
"The question presented is whether a competent adult patient, with no minor dependents, suffering from a terminal illness has the constitutional right to refuse or discontinue extraordinary medical treatment where all affected family members consent. For the reasons expressed and based on the authorities cited by the trial court and the district court of appeal below, we answer the question in the affirmative and thereby approve the decision of the district court of appeal. Because of the clarity of reasoning and articulation of the applicable principles of law contained therein, little could be added by our reformulation of the matters set forth in the opinion below. Accordingly, we adopt the opinion of the district court as our own with the caveat that the reach of this decision does not extend beyond the particular facts presented in the case before us."
379 So.2d at 360.
The Fourth District's decision, in turn, which the Florida Court adopted as its own in Perlmutter, establishes the basic framework for analyzing cases of this nature:
"The pros and cons involved in such tragedies which bedevil contemporary society, mainly because of incredible advancement in scientific medicine, are all exhaustively discussed in Superintendent of Belchertown v. Saikewicz, Mass., [373 Mass. 728] 370 N.E.2d 417 (1977). As Saikewicz points out, the right of an individual to refuse medical treatment is tempered by the State's:
1. Interest in the preservation of life.
2. Need to protect innocent third parties.
3. Duty to prevent suicide.
4. Requirement that it help maintain the ethical integrity of medical practice.

*685 In the case at bar, none of these four considerations surmount the individual wishes of Abe Perlmutter. Thus we adopt the view of the line of cases discussed in Saikewicz which would allow Abe Perlmutter the right to refuse or discontinue treatment based upon the `constitutional right to privacy ... an expression of the sanctity of individual free choice and self-determination.' (Id. 370 N.E.2d 426.) We would stress that this adoption is limited to the specific facts now before us, involving a competent adult patient."
362 So.2d at 162.

B
This basic analysis has been held applicable in a case where, as here, a hospital patient refuses a blood transfusion in a lifethreatening situation. In St. Mary's Hospital v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985), a twenty-seven-year-old hospital patient refused a blood transfusion on religious grounds under circumstances in which it appeared probable that the patient would die without the transfusion. The patient was fully competent, was a practicing Jehovah's Witness with a deeply held religious conviction that blood transfusions are sinful, had a minor child living with his former wife in Michigan, and was obligated to pay fifty dollars a week in support of this child. The Fourth District affirmed a trial court order upholding the constitutional right of the patient to refuse a blood transfusion under the circumstances of this case.
The court framed the question before it and adopted the basic Perlmutter analysis as follows:
"The basic question to be answered in this case is: Can an adult patient in full command of his faculties refuse a blood transfusion? We answer in the affirmative subject to the four caveats set forth in Perlmutter I: preservation of life, protection of the parties, prevention of suicide and the ethics of medical practice."
465 So.2d at 668.
First, as to the state's interest in preservation of life, the court noted that this was a laudable and compelling goal for the state, but was not an "unswerving mandate." The court reasoned:
"We have hitherto held that an adult patient has a constitutional right of privacy, a freedom to choose and a right of self-determination. Perlmutter I. Thus if an adult, competent patient refuses a blood transfusion, it would appear he has a right to do so, providing there is no overriding reason why his life should be preserved. Moreover blood transfusions are not without risk and we take judicial notice of the adverse consequences, perhaps abhorrent to the donee, which can arise from a transfusion of impure blood.
The patient's wishes in this case are rendered even more compelling because of the presence of deeply held religious convictions. In this connection, we read with approval the case of In the Matter of Osborne, 294 A.2d 372 (D.C.App. 1972), where the court spoke about the thirty-four year old Jehovah's Witness' preference for everlasting life and salvation rather than a few more waking hours on this earth. It is hard to fault such a deeply held conviction.
As we see it, under the facts presented, this competent, sick adult has the right to refuse a transfusion regardless of whether his refusal to do so arises from fear of adverse reaction, religious belief, recalcitrance or cost."
465 So.2d at 668. The court further noted that a different case would be presented if a parent or guardian refused a transfusion for a minor child as this action would not be, as here, "an exercise in self-determination," but instead "an assumed right to determine the destiny of another." Id.
Second, as to the state's interest in protecting third parties, the sole interest relied on by the Hospital in the instant case to override the patient's rights herein, the court conceded that "[t]his is probably the most difficult hurdle to overcome in the case at bar." 465 So.2d at 668. The court, however, concluded that this was not an *686 overriding interest in the case based on the following reasoning:
"As we said in Perlmutter I, the protection of third parties is exemplified when the refusal of treatment and subsequent death results in the abandonment of minor children. In that case, there was no minor child. In the case at bar, there is a minor daughter. Yet, it is difficult to categorize the refusal of treatment here as an abandonment. First, the primary physical residence of the child is with the mother in another state; as a result the father seldom sees the child. Second, there is evidence in the record that the mother, and both families, will help to support the child. Third and finally, there is evidence that the patient owns a small annuity which names the child as beneficiary. As a consequence, we cannot fault the trial judge for not finding abandonment."
465 So.2d 668-69.
Third, as to the state's interest in preventing suicide, the court found such interest inapplicable to this case because the record plainly demonstrated that "[t]his patient does not want to die," 465 So.2d at 669. By denying a blood transfusion in the case, it was obvious that nothing was being done to satisfy a desire to die, as there was no such desire on the part of the subject patient.
Finally, as to the state's interest in maintaining the ethical integrity of medical practice, the court concluded that such interest could not justify the blood transfusion in this case. The court adopted its prior Perlmutter analysis on this question which in a nutshell holds that it is consistent with medical ethics to recognize a patient's right to refuse medical treatment under appropriate circumstances. It goes without saying, however, that the medical personnel who accede to the patient's wishes in refusing medical assistance in these circumstances, cannot, the court says, be held criminally or civilly liable for their conduct. 465 So.2d at 669.

C
Although the point involved is not free from doubt, the result reached in the Ramsey case appears to be completely consistent with most cases which have considered the same issue in other jurisdictions. It would appear that, generally speaking, the courts have held that a fully competent adult patient may refuse on religious or other grounds to receive a lifesaving blood transfusion, Mercy Hospital, Inc. v. Jackson, 62 Md. App. 409, 489 A.2d 1130 (Ct.Spec.App. 1985); In re Brown, 478 So.2d 1033 (Miss. 1985); In re Brooks Estate, 32 Ill.2d 361, 205 N.E.2d 435 (1965), even where the patient has minor children whom he supports, so long as these children will be adequately cared for in the event the patient dies. In re Osborne, 294 A.2d 372 (D.C.App. 1972) (cited with approval in St. Mary's Hospital v. Ramsey, 465 So.2d 666, 668 (Fla. 4th DCA 1985)). This result is, of course, different where the patient is not competent because of her medical condition to make a decision on the matter and is the mother of a minor child, Application of the President and Directors of Georgetown College, 331 F.2d 1000 (D.C. Cir.) (Wright, J.), petition for reh'g denied, 331 F.2d 1010 (D.C. Cir.1964), or where the refusal to administer the blood transfusion would result in the death of the patient's unborn child, Raleigh Fitkin-Paul Morgan Memorial Hospital, 42 N.J. 421, 201 A.2d 537 (1964); In re Application of Jamaica Hospital, 128 Misc.2d 1006, 491 N.Y.S.2d 898 (Sup.Ct. 1985), or where the minor children involved would be abandoned in the event of the patient's death. Application of Winthrop University Hospital, 128 Misc.2d 804, 490 N.Y.S.2d 996 (Sup.Ct. 1985).
Central to Ramsey and the above line of cases in other jurisdictions is a delicate balancing analysis in which the courts weigh, on the one hand, the patient's constitutional right of privacy and right to practice one's religion, as against certain basic societal interests. Obviously, there are no preordained answers to such problematic questions and the results reached in these cases are highly debatable. Running *687 through all of these decisions, however, is the courts' deeply imbedded belief, rooted in our constitutional traditions, that an individual has a fundamental right to be left alone so that he is free to lead his private life according to his own beliefs free from unreasonable governmental interference. Surely nothing, in the last analysis, is more private or more sacred than one's religion or view of life, and here the courts, quite properly, have given great deference to the individual's right to make decisions vitally affecting his private life according to his own conscience. It is difficult to overstate this right because it is, without exaggeration, the very bedrock on which this country was founded.
Mr. Justice Brandeis said it best:
"The makers of our Constitution ... sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone  the most comprehensive of rights and the right most valued by civilized man."
Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, 956 (1928) (Brandeis, J., dissenting). Former Chief Justice Burger, then Judge Burger, cited this great passage from Brandeis in a Jehovah's Witness, blood transfusion case in support of his basic position that the courts ought not intervene to direct hospital patients to receive blood transfusions against their will. He added:
"Nothing in this utterance suggests that Justice Brandeis thought an individual possessed these rights only as to sensible beliefs, valid thoughts, reasonable emotions, or well-founded sensations. I suggest he intended to include a great many foolish, unreasonable and even absurd ideas which do not conform, such as refusing medical treatment even at great risk."
Application of President and Directors of Georgetown College, Inc., 331 F.2d 1010, 1017 (D.C. Cir.1964) (Burger, J., separate opinion).
Viewed in the abstract and without the benefit of our constitutional heritage, the rights of the individual in this area of law may seem to some rather paltry when weighed against the interests of society as a whole. The courts, however, have not approached the delicate balancing process in the above-stated cases with such an ahistorical attitude. On the contrary, the courts have given great deference to the privacy and religious freedom rights involved in the subject balance  and have required only the most compelling of societal interests to override such rights. The death or abandonment of the patient's minor child, for example, has been required by most courts to override the patient's constitutional right to refuse medical treatment in the form of a blood transfusion.

III
Turning to the instant case, we conclude, in balance, that Mrs. Wons' constitutional right to exercise her religious freedom and to lead her private life according to her own conscience has not been overridden in this case by a compelling societal interest, based on the Perlmutter-Ramsey analysis established for cases of this nature. We reach this result for three reasons.
First, Mrs. Wons, without dispute, is a competent adult and a practicing Jehovah's Witness who deeply believes that it is a grave sin, contrary to the commandments of God, to give or receive transfusions of blood. Prima facie, then, she has, under the established law, a constitutional right to refuse medical treatment for herself in the form of a blood transfusion. Only the most grave of societal interests may override this most important constitutional right.
Second, the Hospital concedes, and we entirely agree, that three of the four societal interests under Perlmutter and Ramsey, which potentially could override Mrs. Wons' constitutional rights, are entirely absent in this case, to wit: the state's interest in preserving life, preventing suicide, and maintaining the ethical integrity of medical practice. Plainly, Ramsey puts these interests entirely to rest when dealing, as here, with a fully competent adult who refuses a blood transfusion for religious reasons.
*688 Third, the societal interest in protecting Mrs. Wons' two minor children as recognized in Perlmutter and Ramsey  although a vital and troubling consideration in this case  cannot, in our view, override Mrs. Wons' constitutional right to refuse a blood transfusion under the circumstances of this case. This is so because, simply put, Mrs. Wons' probable, but not certain, demise by refusing the subject blood transfusions will not result in an abandonment of her two minor children. According to the undisputed testimony below, she has a tightly knit family unit, all practicing Jehovah's Witnesses, all of whom fully support her decision to refuse a blood transfusion, all of whom will care for and rear the two minor children in the event she dies. Her husband will, plainly, continue supporting the two children with the aid of her two brothers; her mother, a sixty-two-year-old woman in good health, will also care for the children while her husband is at work. Without dispute, these children will not become wards of the state and will be reared by a loving family.
We do not fault Judge Newbold's conclusion that these children will not receive an important intangible, to wit: the love and upbringing of their mother, in the event Mrs. Wons dies; no doubt they will be poorer by such a grave loss. Still, they will not be abandoned; they will be reared by a loving religious family; and they will no doubt cherish the memory of a courageous mother who in time of peril stood by her religious convictions. Indeed, that is a legacy which many living mothers would give anything to leave to their children. The parens patriae doctrine invoked herein cannot, we think, measure increments of love; it cannot mandate a two-parent, rather than a one-parent family; it is solely concerned with seeing to it that minor children are cared for and are not abandoned. These children, without doubt, will be cared for if Mrs. Wons dies and, in this respect, will be no different than many well-adjusted children from one-parent extended families in this country. As in Ramsey, there is no showing of an abandonment of minor children, and, consequently, Mrs. Wons' constitutional right to refuse a blood transfusion is not overridden under the circumstances of this case.
The final order under review is reversed, but, in view of the fact that the Hospital has already administered the subject blood transfusion to Mrs. Wons, no immediate action on remand is required. In the event, however, that Mrs. Wons may medically require a blood transfusion in the future due to the condition which brought her to the hospital in this case, the trial court will be guided by the principles announced in this opinion in determining whether to order a second blood transfusion, if petitioned for such an order by the Hospital.
Reversed.
BASKIN, J., concurs.
SCHWARTZ, Chief Judge (dissenting).
With the greatest respect for the majority's conscientiously held and eloquently expressed views, I am compelled to disagree. While, because of the court's extensive analysis of the cases and the fact that our high court will decide the question in any event, I deem an elaborate dissent unnecessary, suffice it to say that I believe that the state's interests in preserving the existence of Mrs. Wons's life and the quality of her minor children's are such that she may not be permitted to die. I would affirm.