BARKETT, Justice.
We have for review In re Guardianship of Browning, 543 So.2d 258 (Fla. 2d DCA 1989), in which the district court certified the following question as one of great public importance:
Whether the guardian of a patient who is incompetent but not in a permanent *8 vegetative state and who suffers from an incurable, but not terminal condition, may exercise the patient’s right of self-determination to forego sustenance provided artificially by a nasogastric tube?
Id. at 274.[1] We answer the question in the affirmative as qualified in this opinion.
I. THE FACTS
On November 19, 1985, a competent Estelle Browning executed a declaration that provides, in part:
If at any time I should have a terminal condition and if my attending physician has determined that there can be no recovery from such condition and that my death is imminent, I direct that life-prolonging procedures be withheld or withdrawn when the application of such procedures would serve only to prolong artificially the process of dying.
In addition, Mrs. Browning stipulated that she desired not to have “nutrition and hydration (food and water) provided by gastric tube or intravenously.”[2]
At eighty-six years of age, Mrs. Browning suffered a stroke. She was admitted to the hospital on November 9, 1986, where her treating physician diagnosed a massive hemorrhage in the left parietal region of the brain, the portion that controls cognition. Because Mrs. Browning was unable to swallow, she underwent a gastrostomy on November 20 during which a feeding tube was inserted directly into her stomach.
The following day, she was discharged from the hospital and transferred to a nursing home where she remained bedridden and required total care. Mrs. Browning’s second cousin and only living relative, Doris Herbert, eighty, was then appointed guardian of the person and property of Mrs. Browning.
During the course of her stay in the nursing home, Mrs. Browning was plagued with physical difficulties, including complications with her feeding tube, which became dislodged.[3] The gastrostomy tube was replaced by a nasogastric tube on May 19, 1988.[4]
Nearly two years after Mrs. Browning suffered her stroke, the guardian filed a petition in circuit court to terminate the nasogastric feeding based upon Mrs. Browning’s living will. At the evidentiary hearing, the guardian presented additional evidence of Mrs. Browning’s wishes. The evidence reflected that a predecessor living will, written in 1980, contained the same provisions for rejection of medical treatment at issue as the one presently before the Court. Believing that the death of a witness to the 1980 will might have rendered the will invalid, she executed the 1985 document. Neighbors also testified that Mrs. Browning had expressed her wishes orally in this regard several times. Mrs. Rose Kings, a close personal friend of Mrs. Browning since 1965, witnessed Mrs. Browning execute the 1985 document. She testified that Mrs. Browning signed the declaration about two days after visiting patients in a nursing home and had said, “ ‘Oh Lord, I hope this never happens to me ... thank God I’ve got this taken care *9 of. I can go in peace when my time comes.’ ” Mrs. Kings’ husband added that Mrs. Browning had a friend in the hospital on life-support and remarked that she “ ‘never want[ed] to be that way.’ ”
The guardian, Mrs. Herbert, who had lived with Mrs. Browning from 1982 to 1986, testified that she had discussed the withdrawal of life-prolonging measures with Mrs. Browning following the death of Mrs. Browning’s husband in 1978. According to Mrs. Herbert, Mrs. Browning said that she did not want to be maintained through artificial life-support mechanisms.
The consensus of the medical evidence indicated that the brain damage caused by the hemorrhage was major and permanent and that there was virtually no chance of recovery. Death would occur within seven to ten days were the nasogastric feeding tube removed. However, Mrs. Browning’s life could have been prolonged up to one year as long as she was maintained on the feeding tube and assuming the absence of infection.
At the same time, the medical evidence reflected that Mrs. Browning was not comatose. Although she was noncommunica-tive, she “appeared alert and would follow [a visitor] with her eyes.” However, she “would not blink in any consistent pattern when asked to respond to simple questions[,] ... would not follow any simple commands[, and] ... would not look to the right or to the left on command.” A nurse testified that Mrs. Browning had attempted to say a word on a few occasions, although she conceded that the words had not been clear and the speech was garbled.
Dr. James Barnhill, a neurologist, described Mrs. Browning as noncommunica-tive and essentially existing only by virtue of fluid and nutrition supplied by the feeding tube. Dr. Barnhill opined that she was in a persistent vegetative state, which he defined as the absence of cognitive behavior and inability to communicate or interact purposefully with the environment.
The trial court found that Mrs. Browning could continue to live for an indeterminate time with artificial sustenance but that death would result within four to nine days without it. Construing Florida’s “Life-Prolonging Procedure Act,” sections 765.-01-.15, Florida Statutes (1987), the trial court concluded that death was not imminent, and it denied the petition.
The district court affirmed the trial court’s decision that the termination of this treatment was not permitted by the statute. However, the district court held that Mrs. Browning was entitled to relief under our state constitution, which expressly recognized every citizen’s basic right of privacy. Browning, 543 So.2d at 261. The district court then authorized the guardian to make the decision in accordance with procedures established in the opinion.
II. A COMPETENT PERSON’S RIGHT OF PRIVACY
We agree with the district court that chapter 765 of the Florida Statutes (1987) is not applicable to Mrs. Browning’s situation.[5] We also agree with the district court that Mrs. Browning’s fundamental right of self-determination, commonly expressed as the right of privacy, controls this case.
Because the word “privacy” generally has been used in common parlance in its informational or disclosural sense, its broader meaning has been somewhat ignored. However, the concept of privacy encompasses much more than the right to control the disclosure of information about oneself. “Privacy” has been used interchangeably with the common understanding of the notion of “liberty,” and both imply a fundamental right of self-determination subject only to the state’s com *10 pelling and overriding interest. For example, privacy has been defined as an individual’s “control over or the autonomy of the intimacies of personal identity,” Gerety, Redefining Privacy, 12 Harv.C.R.-C.L.L. Rev. 233, 281 (1977); or as a “physical and psychological zone within which an individual has the right to be free from intrusion or coercion, whether by government or by society at large.” Cope, To Be Let Alone: Florida’s Proposed Right of Privacy, 6 Fla.St.U.L.Rev. 671, 677 (1978).
These components of privacy are the same as those encompassed in the concept of freedom, and, as recognized in In re T.W., 551 So.2d 1186 (Fla.1989), are deeply rooted in our nation’s philosophical and political heritage. See also Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla.1985). In Florida, we have recognized that this fundamental right of privacy has been expressly enumerated in article I, section 23 of the Florida Constitution, which provides “an explicit textual foundation for those privacy interests inherent in the concept of liberty.” Rasmussen v. South Fla. Blood Serv., Inc., 500 So.2d 533, 536 (Fla.1987).
Thus, we begin with the premise that everyone has a fundamental right to the sole control of his or her person. As Justice Cardozo noted seventy-six years ago:
Every human being of adult years and sound mind has a right to determine what shall be done with his own body....
Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914). An integral component of self-determination is the right to make choices pertaining to one’s health, including the right to refuse unwanted medical treatment. “We can conceive of few more personal or private decisions concerning one’s body that one can make in the course of a lifetime ... [than] the decision of the terminally ill in their choice of whether to discontinue necessary medical treatment.” In re T.W., 551 So.2d at 1192; see Public Health Trust v. Wons, 541 So.2d 96 (Fla.1989).
Recognizing that one has the inherent right to make choices about medical treatment, we necessarily conclude that this right encompasses all medical choices. A competent individual has the constitutional right to refuse medical treatment regardless of his or her medical condition. Wons; accord Cruzan ex rel. Cruzan v. Director, Mo. Dep’t of Health, — U.S. -, 110 S.Ct. 2841, 2852, 111 L.Ed.2d 224 (1990) (“for the purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition”). The issue involves a patient’s right of self-determination and does not involve what is thought to be in the patient’s best interests.
More is involved in respect for self-determination than just the belief that each person knows what’s best for him- or herself.... Even if it could be shown that an expert (or a computer) could do the job better, the worth of the individual, as acknowledged in Western ethical traditions and especially in Anglo-American law, provides an independent — and more important — ground for recognizing self-determination as a basic principle in human relations, particularly when matters as important as those raised by health care are at stake.
President’s Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, I Making Health Care Decisions 44-45 (1982).
Courts properly have regarded the subjective desires of competent adults to fore-go medical intervention as dispositive. As the California Court of Appeal wrote in the case of Elizabeth Bouvia:
She, as the patient, lying helplessly in bed, unable to care for herself, may consider her existence meaningless. She cannot be faulted for so concluding. If her right to choose may not be exercised because there remains to her, in the opinion of a court, a physician or some committee, a certain arbitrary number of years, months, or days, her right will have lost its value and meaning.
Who shall say what the minimum amount of available life must be? Does it matter if it be 15 to 20 years, 15 to 20 *11 months, or 15 to 20 days, if such life has been physically destroyed and its quality, dignity and purpose gone? As in all matters lines must be drawn at some point, somewhere, but that decision must ultimately belong to the one whose life is in issue.
Bouvia v. Superior Court, 179 Cal.App.3d 1127, 1142-43, 225 Cal.Rptr. 297, 304-05 (Ct.App.), review denied (June 5, 1986). Mrs. Bouvia was a competent twenty-eight-year-old quadriplegic who suffered from severe cerebral palsy and degenerative and severely crippling arthritis. She was completely bedridden, immobile, physically helpless, and totally dependent upon others for her care. Respecting her right to refuse “any medical treatment,” the court approved her request to remove immediately a nasogastric tube that kept her alive. Id. at 1137, 225 Cal.Rptr. at 300 (emphasis in original). See also State v. McAfee, 259 Ga. 579, 385 S.E.2d 651 (1989); In re Roquena, 213 N.J.Super. 475, 517 A.2d 886 (Super.Ct.Ch.Div.), aff'd, 213 N.J.Super. 443, 517 A.2d 869 (Super.Ct.App.Div.1986).
Likewise, this Court has honored the subjective choices of competent patients to refuse medical treatment. In Public Health Trust v. Wons, 541 So.2d 96 (Fla.1989), we held that a competent, thirty-eight-year-old practicing Jehovah’s Witness could exercise her constitutional right to refuse an emergency blood transfusion, without which her death was certain to follow shortly. We approved the opinion of the district court, which concluded that Mrs. Wons was entitled “to exercise her religious freedom and to lead her private life according to her own conscience.” Wons v. Public Health Trust, 500 So.2d 679, 687 (Fla. 3d DCA 1987), approved, 541 So.2d 96 (Fla.1989). Also, in Satz v. Perlmutter, 379 So.2d 359 (Fla.1980), adopting 362 So.2d 160 (Fla. 4th DCA 1978), we held that a competent, seventy-three-year-old patient who was suffering from terminal, incurable amyotrophic lateral sclerosis, was entitled to remove a mechanical respirator, without which death would occur within a short time. Mr. Perl-mutter complained that his life was “miserable,” and at a bedside hearing he testified that his condition without the respirator “can’t be worse than what I’m going through now.” Satz, 362 So.2d at 161.
We conclude that a competent person has the constitutional right to choose or refuse medical treatment, and that right extends to all relevant decisions concerning one’s health.[6] Courts overwhelmingly have held that a person may refuse or remove artificial life-support, whether supplying oxygen by a mechanical *12 respirator[7] or supplying food and water through a feeding tube.[8] We agree and find no significant legal distinction between these artificial means of life-support.
III. AN INCOMPETENT PERSON’S RIGHT OF PRIVACY
Having determined that a competent person has the constitutionally protected right to choose or reject medical treatment, we consider whether this right is lost or diminished by virtue of physical or mental incapacity or incompetence.[9] We previously determined that it is not. In John F. Kennedy Memorial Hospital, Inc. v. Bludworth, 452 So.2d 921, 923 (Fla.1984), this Court held that an incompetent person has the same right to refuse medical treatment as a competent person. Thus, our cases have recognized no basis for drawing a constitutional line between the protections afforded to competent persons and incompetent persons. Indeed, the right of privacy would be an empty right were it not to extend to competent and incompetent persons alike. In re Guardianship of Barry, 445 So.2d 365, 370 (Fla. 2d DCA 1984). As we have already stated:
The primary concern ... is that this valuable right should not be lost because the noncognitive and vegetative condition of the patient prevents a conscious exercise of the choice to refuse further extraordinary treatment.
Bludworth, 452 So.2d at 924. Accord Cruzan ex rel. Cruzan v. Director, Mo. Dep’t of Health, 110 S.Ct. at 2852 (1990) (fourteenth amendment due process liberty interest).
IV. ANOTHER MAY EXERCISE THE INCOMPETENT’S RIGHT TO FOREGO MEDICAL TREATMENT
The real issue before us is an extension of the one presented in Bludworth. When a person is unable to personally and directly express his or her desires for health care because of physical and mental incapacity,[10] “[t]he question is who will exercise this right and what parameters will limit them in the exercise of this right.” Bludworth, 452 So.2d at 924-25. In Bludworth, the question related to a comatose *13 patient. Mrs. Browning, in comparison, was not in a total comatose state. However, we fail to see a significant legal distinction. As we previously noted, the right involved here is one of self-determination that cannot be qualified by the condition of the patient. In this case, as in Bludworth, the patient was unable to personally or directly exercise the right to refuse medical treatment. Significantly, the patients in both cases, while competent, had executed written documents expressing their wishes.
We find that the district court correctly followed the principles underlying Bludworth. We hold that, because Mrs. Browning was unable to exercise her constitutional right of privacy by reason of her medical condition, her guardian was authorized to exercise it for her. As in Blud-worth, we do not limit the ability to exercise this right only to a legally appointed guardian, but recognize that it may be exercised by proxies or surrogates such as close family members or friends.[11] We emphasize and caution that when the patient has left instructions regarding life-sustaining treatment, the surrogate must make the medical choice that the patient, if competent, would have made, and not one that the surrogate might make for himself or herself, or that the surrogate might think is in the patient’s best interests. As the court below aptly noted:
[I]t is important for the surrogate deci-sionmaker to fully appreciate that he or she makes the decision which the patient would personally choose. In this state, we have adopted a concept of “substituted judgment.” [In re Guardianship of Barry, 445 So.2d 365, 370-71 (Fla. 2d DCA 1984) ]. One does not exercise another’s right of self-determination or fulfill that person’s right of privacy by making a decision which the state, the family, or public opinion would prefer. The surrogate decisionmaker must be confident that he or she can and is voicing the patient’s decision.
The Ethics and Advocacy Task Force, as amicus curiae, raises a very legitimate concern that the “right to die” could become a license to kill. There are times when some people believe that another would be “better off dead” even though the other person is still fighting vigorously to live. Euthanasia is a crime in this state. § 782.08, Fla.Stat. (1987). See § 765.11(1), Fla.Stat. (1987). Despite the tremendous advances achieved in this century, the world has witnessed the extermination of retarded and mentally disturbed persons for whom a foreign government decided that death was the proper prescription. Thus, it cannot be overemphasized that the remedy announced in this opinion and the procedures designed to safeguard that remedy are based upon the patient’s right to make a personal and private decision and not upon other interests.
Browning, 543 So.2d at 269 (emphasis in original).
The state argues that we should not permit the enforcement of Mrs. Browning’s expressed wish because we can never know whether Mrs. Browning may have changed her mind. A critical problem regarding the exercise of an incompetent’s choice is sometimes posed by the inability of the incompetent to express his or her immediate wishes. Unfortunately, human limitations preclude absolute knowledge of the wishes of someone in Mrs. Browning’s condition. However, we cannot avoid making a decision in these circumstances, for even the failure to act constitutes a choice. That choice must be the patient’s choice whenever possible. The right of privacy requires that we must safeguard an individual’s right to chart his or her own medical course in the event of later incapacity.
V. COMPELLING STATE INTEREST
The state has a duty to assure that a person’s wishes regarding medical treatment are respected.[12] That obligation *14 serves to protect the rights of the individual from intrusion by the state unless the state has a compelling interest great enough to override this constitutional right. The means to carry out any such compelling state interest must be narrowly tailored in the least intrusive manner possible to safeguard the rights of the individual.
Cases decided by this Court have identified state interests in the preservation of life, the protection of innocent third parties, the prevention of suicide, and maintenance of the ethical integrity of the medical profession, and have balanced them against an individual’s right to refuse medical treatment.
The state’s interest in the preservation of life generally is considered the most significant state interest. However, “ ‘there is a substantial distinction in the State’s insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long and at what cost to the individual [his] [or her] life may be briefly extended.’ ” Satz v. Perlmutter, 362 So.2d 160, 162 (Fla. 4th DCA 1978) (quoting Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 740-44, 370 N.E.2d 417, 425-26 (1977)), adopted, 379 So.2d 359 (Fla.1980). Hence, in Satz, we determined that a competent person suffering from an incurable affliction could refuse medical treatment. See also Wons. Likewise, in Bludworth, the state interests were insufficient to override the decision of a guardian or close family members carrying out the wishes of an incompetent patient not to be kept alive through the use of life-sustaining measures. Bludworth, 452 So.2d at 926.
Two other asserted state interests do not merit much discussion. First, there is no issue in this ease pertaining to third parties. Second, suicide is not an issue when, as here, the discontinuation of life support “in fact will merely result in [her] death, if at all, from natural causes.” Satz, 362 So.2d at 162.
The last and least significant of the aforementioned state interests is the maintenance of ethical integrity of the medical profession. However, “[Recognition of the right to refuse necessary treatment in appropriate circumstances is consistent with existing medical mores; such a doctrine does not threaten either the integrity of the medical profession, the proper role of hospitals in caring for such patients[,] or the State’s interest in protecting the same.” Satz, 362 So.2d at 163 (quoting Saikewicz, 373 Mass, at 742-45, 370 N.E.2d at 426-27). “Given the fundamental nature of the constitutional rights involved, protection of the ethical integrity of the medical profession alone could never override those rights.” Wons, 541 So.2d at 101 (Ehrlich, C.J., concurring specially).
As we noted in Wons, the state interests discussed above are “by no means a bright-line test, capable of resolving every dispute regarding the refusal of medical treatment. Rather, they are intended merely as factors to be considered while reaching the difficult decision of when a compelling state interest may override the basic constitutional right[ ] of privacy.” Wons, 541 So.2d at 97.[13] We are satisfied that the state’s interests do not outweigh the right of the individual to forego life-sustaining measures.
VI. PROCEDURES FOR THE DECISION-MAKER
The state argues that its interests are substantial enough to require more procedural protections than those provided in the district court’s opinion. The state urges us to quash that section of the district court’s opinion that permits a surrogate to make this life-or-death decision in a “private set *15 ting.” Instead, the state suggests that we implement a judicial procedure requiring the surrogate to obtain prior court approval, giving an opportunity for the state or interested parties to be heard.
We cannot ignore the possibility that a surrogate might act contrary to the wishes of the patient. Yet, we are loath to impose a cumbersome legal proceeding at such a delicate time in those many cases where the patient neither needs nor desires additional protection. The decision to terminate artificial life-sustaining measures is being made over and over in nursing homes, hospitals, and private homes in this nation. It is being made painfully by loving family members, concerned guardians, or surrogates, in conjunction with the advice of ethical and caring physicians or other health care providers. It is being made when the only alternative to a natural death is to artificially maintain a bare existence. See In re Guardianship of Barry, 445 So.2d 365, 371 (Fla. 2d DCA 1984).
We are persuaded that when the patient has taken the time and the trouble to specifically express his or her wishes for future health care in the event of later incapacity, the surrogate need not obtain prior judicial approval to carry out those wishes. This applies whether the patient has expressed his or her desires in a “living will,” through oral declarations, or by the written designation of a proxy to make all health care decisions in these circumstances.[14] We recognize that instructions evinced in the form of a “living will” or other written or oral statements may not have designated a decision-maker to carry out those instructions. In instances when a patient has left instructions, the patient may designate, orally or in writing, the decision-maker who is to carry out those instructions; but the patient need not do so.[15] However, when the patient has not expressed instructions, but has merely delegated full responsibility to a proxy, the designation of the proxy must have been made in writing.
A surrogate must take great care in exercising the patient’s right of privacy, and must be able to support that decision with clear and convincing evidence. Before exercising the incompetent’s right to forego treatment, the surrogate must satisfy the following conditions:
1. The surrogate must be satisfied that the patient executed any document knowingly, willingly, and without undue influence, and that the evidence of the patient’s oral declarations is reliable;
2. The surrogate must be assured that the patient does not have a reasonable probability of recovering competency so that the right could be exercised directly by the patient; and
3. The surrogate must take care to assure that any limitations or conditions expressed either orally or in the written declaration have been carefully considered and satisfied.
Likewise, when a proxy has been designated to make the decision without explicit instructions from the patient, the proxy must satisfy the following conditions:
1. The proxy must be satisfied that the patient executed the written designation of proxy knowingly, willingly, and without undue influence; and
*16 2. The proxy must be assured that the patient does not have a reasonable probability of recovering competency so that the right could be exercised directly by the patient.
In determining whether the patient may recover competency or whether a medical condition or limitation referred to in the declaration exists, the surrogate or proxy must obtain, and may rely upon, certificates [16] from the patient’s “primary treating physician” and “at least two other physicians with specialties relevant to the patient’s condition.” Bludworth, 452 So.2d at 926.
VII. CHALLENGES TO THE DECISION
We emphasize, as did the district court, that courts are always open to adjudicate legitimate questions pertaining to the written or oral instructions.[17] First, the surrogate or proxy may choose to present the question to the court for resolution. Second, interested parties may challenge the decision of the proxy or surrogate.
When the decision of a proxy or surrogate is challenged, a written declaration or designation of proxy, in the absence of any evidence of intent to the contrary, establishes a rebuttable presumption that constitutes clear and convincing evidence of the patient’s wishes. Evidence of the physicians’ certificates establishing the existence of any medical condition required by the declaration likewise establishes a rebuttable presumption that these conditions have been satisfied.
Although a surrogate may rely on oral statements made by the incompetent, while competent, to exercise the incompetent’s wishes to forego life-sustaining treatment, the presumption of clear and convincing evidence that attaches to a written declaration does not attach to purely oral declarations. Oral evidence, considered alone, may constitute clear and convincing evidence. However, the surrogate would bear the burden of proof if a decision based on purely oral evidence is challenged.
Because the only issue before the court is a determination of the patient’s wishes, challenges generally would be limited to that issue. For example, there may be challenges to claims that the declaration was not executed knowingly, willingly, and without undue influence; that the patient had changed his or her mind after executing the declaration; that the declaration was ambiguous; that the conditions or limitations contained in the declaration were not satisfied; that the surrogate or proxy was the one actually designated; and, of course, that there was a reasonable probability that the patient would regain competency. When the only evidence of intent is an oral declaration, the accuracy and reliability of the declarant’s oral expression of intent also may be challenged.
For example, Mrs. Browning made a written declaration. Had Mrs. Browning merely indicated in her written document that she wanted to refuse any and all efforts to artificially prolong her life, viable challenges to her guardian’s decision to implement those wishes would have includ *17 ed: that Mrs. Browning changed her mind; that she executed the document unknowingly, unwillingly, or under undue influence; or that there existed a reasonable probability that she would regain competency. Evidence on other issues generally would have been irrelevant to the only issue to be decided — the patient’s wishes.
In this instance, however, Mrs. Browning’s wishes were conditional. She indicated that her decision to refuse treatment was limited to a time when she had a “terminal condition” from which her attending physician determined that there could be “no recovery” and that “death [was] imminent.” Thus, in a case like this one, the surrogate’s conclusions as to those matters could become additional bases of challenge. We are satisfied in this case that the surrogate’s conclusions were correct. No one questioned that the declaration was executed by Mrs. Browning knowingly, willingly, and without undue influence. Nor was there any question that Mrs. Browning was beyond hope of regaining her competency and making the decision herself. Thus, the only question was whether the conditions established by Mrs. Browning in her declaration were satisfied.
The trial court found that death would occur within four to nine days after removal of the nasogastric tube. Therefore, Mrs. Browning’s life could only have been sustained beyond that time by the administration of artificial, intrusive medical measures. Under those circumstances, Mrs. Browning’s death was imminent as we con-. strue her express written intent. In addition, all the doctors agreed that Mrs. Browning suffered permanent brain damage and the medical testimony established that there was no hope that she would recover from her condition. We are satisfied that clear and convincing evidence existed to support a finding that Mrs. Browning suffered from a terminal condition. Under these circumstances, the surrogate was correct in instructing Mrs. Browning’s health care providers to discontinue all life-sustaining procedures in accordance with Mrs. Browning’s wishes.
VIII. CONCLUSION
We have previously held that competent and incompetent persons have the right to determine for themselves the course of their medical treatment. Today we hold that, without prior judicial approval, a surrogate or proxy, as provided here, may exercise the constitutional right of privacy for one who has become incompetent and who, while competent, expressed his or her wishes orally or in writing. We also determine that there is no legal distinction between gastrostomy or nasogas-tric feeding and any other means of life support. This case resolves a question of an individual’s constitutional right of self-determination. We are hopeful that this ■ decision will encourage those who want their wishes to be followed to express their wishes clearly and completely.
For the reasons expressed above, we answer the certified question in the affirmative as qualified here and approve the decision of the district court.
It is so ordered.
SHAW, C.J., and EHRLICH, GRIMES and KOGAN, JJ., concur.
MeDONALD, J., concurs with an opinion.
OVERTON, J., concurs in part and dissents in part with an opinion.

. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. Estelle Browning died on July 16, 1989, at the age of 89. Although the claim is moot, we accept jurisdiction because the issue raised is of great public importance and likely to recur. In re T.W., 551 So.2d 1186, 1189 (Fla.1989); Holly v. Auld, 450 So.2d 217, 218 n. 1 (Fla.1984).

. The entire form is reproduced in the appendix of the district court’s opinion. In re Guardianship of Browning, 543 So.2d 258, 275 (Fla. 2d DCA 1989).

. The ailments included numerous episodes of vomiting; numerous bed sores, some of which evidenced profuse drainage; bruises and blisters on extremities; swelling of the hands, feet, and ankles; ingrown toenails; sporadic vaginal bleeding; and rectal discharge. The complications included leakage from the tube; drainage from the incision around the tube; plugging of the catheter bulb, which required frequent replacement and insertion; and leakage from the catheter. Like the district court, we are distressed at the need to discuss the details of Mrs. Browning’s condition.

.Gastrostomy and nasogastric tubes are two means of supplying nutrition and hydration to the patient. The former is surgically placed into the stomach through the abdomen, and the latter is placed into the stomach through the nose and esophagus.

. Section 765.04(1) of the Florida Statutes (1987) permits competent adults to order the withholding or withdrawal of “life-prolonging procedures" under certain conditions. Section 765.03(3) of the Florida Statutes (1987) specifically excludes the provision of sustenance from the term "life-prolonging procedure.” We note that the legislature has since expanded the definition of "life-prolonging procedure” to include the provision of sustenance. Effective October 1, 1990, a patient may authorize the withholding or withdrawal of nutrition or hydration under certain circumstances. Ch. 90-223, Laws of Fla.

. We see no reason to qualify that right on the basis of the denomination of a medical procedure as major or minor, ordinary or extraordinary, life-prolonging, life-maintaining, life-sustaining, or otherwise. Although research disclosed no cases that sought to distinguish these terms in the context of the rights of a competent patient, as opposed to an incompetent patient, courts generally are agreed that the terms are legally indistinguishable. See, e.g., Cruzan ex rel. Cruzan v. Director, Mo. Dep't of Health, — U.S. -, 110 S.Ct. 2841, 2853, 111 L.Ed.2d 224 (1990) (addressing the issue as the refusal of "life-sustaining medical treatment’’); Corbett v. D'Alessandro, 487 So.2d 368, 371 (Fla. 2d DCA) (“We are unable to distinguish on a legal, scientific, or a moral basis between those artificial measures that sustain life — whether by means of ‘forced’ sustenance or ‘forced’ continuance of vital functions — of the vegetative, comatose patient who would soon expire without use of those artificial means.’’), review denied, 492 So.2d 1331 (Fla.1986); Brophy v. New England Sinai Hosp., Inc., 398 Mass. 417, 437, 497 N.E.2d 626, 637 (1986) ("[wjhile we believe that the distinction between extraordinary and ordinary care is a factor to be considered, the use of such a distinction as the sole, or major, factor of decision tends, in a case such as this, [is] to create a distinction without meaning’’); In re Hier, 18 Mass.App.Ct. 200, 207, 464 N.E.2d 959, 964, review denied, 392 Mass. 1102, 465 N.E.2d 261 (1984) (rejecting distinction between nutrition and treatment); In re Gardner, 534 A.2d 947, 954 (Me.1987) (nutrition and hydration indistinguishable from other life-sustaining procedures); In re Conroy, 98 N.J. 321, 367-70, 486 A.2d 1209, 1233-34 (1985) ("[W]e reject the distinction ... between actively hastening death by terminating treatment and passively allowing a person to die of a disease.... [and] also reject any distinction between withholding and withdrawing life-sustaining treatment.”); In re Guardianship of Grant, 109 Wash.2d 545, 563, 747 P.2d 445, 454 (1987) (the right to withhold life-sustaining procedures extends to "all artificial procedures which serve only to prolong the life of a terminally-ill patient”); Gray ex rel. Gray v. Romeo, 697 F.Supp. 580, 588 n. 4 (D.R.I.1988) (no analytical difference between withholding and withdrawing medical treatment).

. See John F. Kennedy Memorial Hosp., Inc. v. Bludworth, 452 So.2d 921 (Fla.1984); Satz v. Perlmutter, 379 So.2d 359 (Fla.1980); State v. McAfee, 259 Ga. 579, 385 S.E.2d 651 (1989); In re Quinlan, 70 N.J. 10, 355 A.2d 647, cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); In re Colyer, 99 Wash.2d 114, 660 P.2d 738 (1983).

. Cruzan ex rel. Cruzan v. Director, Mo. Dep’t of Health, - U.S. -, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); Rasmussen ex rel. Mitchell v. Fleming, 154 Ariz. 207, 741 P.2d 674 (1987); Conservatorship of Drabick, 200 Cal.App.3d 185, 245 Cal.Rptr. 840 (Ct.App.), cert. denied, 488 U.S. 958, 109 S.Ct. 399, 102 L.Ed.2d 387 (1988); Bouvia v. Superior Court, 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (Ct.App.), review denied (June 5, 1986); Corbett v. D’Alessandro, 487 So.2d 368 (Fla. 2d DCA), review denied, 492 So.2d 1331 (Fla.1986); In re Gardner, 534 A.2d 947 (Me.1987); In re Estate of Longeway, 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 (1989); Brophy v. New England Sinai Hosp., Inc., 398 Mass. 417, 497 N.E.2d 626 (1986); In re Hier, 18 Mass.App. 200, 464 N.E.2d 959, review denied, 392 Mass. 1102, 465 N.E.2d 261 (1984); In re Jobes, 108 N.J. 394, 529 A.2d 434 (1987); In re Requena, 213 N.J.Super. 475, 517 A.2d 886 (Ch.Div.), aff'd, 213 N.J.Super. 443, 517 A.2d 869 (App.Div.1986); Delio v. Westchester County Medical Center, 129 A.D.2d 1, 516 N.Y.S.2d 677 (App.Div.1987); Gray ex rel. Gray v. Romeo, 697 F.Supp. 580 (D.R.I.1988).

. Recent statutory changes that have taken effect since the decision of the court below require some explanation of the use of the terms "incompetent” and “incapacitated” in this opinion. The term “incompetent” as used here refers to a status classification valid under applicable sections of the Florida Guardianship Law, chapter 744 of the Florida Statutes (1987). The Florida Guardianship Law was substantially revised effective October 1, 1989. Ch. 89-96, Laws of Fla. The reform legislation makes the word "incompetent" obsolete and replaces the “incompetency” concept with “incapacity," a term defined in the statute to recognize varying levels of capacity among persons who need sur* rogate decision-making by guardians. As used here, the terms “incompetent” and "incapacitated” mean those individuals unable to make medical decisions on their own behalf. Obviously, persons of limited capacity, who have retained the legal right pursuant to court order to make their own medical treatment decisions, will be "competent” to make those decisions.

. This opinion addresses only those persons who are mentally and physically incapacitated and are being sustained by artificial means. We do not address those who are mentally incapacitated but physically are in good health.

. We note that in its most recent session, the legislature passed legislation relating to the appointment of health care surrogates and the creation of a durable power of attorney. Ch. 90-232, §§ 11-24, Laws of Fla.

. As Justice Stevens observed, "[o]ur Constitution is born of the proposition that all legitimate *14 governments must secure the equal right of every person to ‘Life, Liberty, and the pursuit of Happiness.’ " Cruzan ex rel., Cruzan v. Director, Mo. Dep’t of Health, 110 S.Ct. at 2878 (1990) (Stevens, J., dissenting).

. For example, the state may have parens patri-ae interests in protecting an incompetent from an abusive or erroneous decision, see Cruzan, 110 S.Ct. at 2853, in avoiding unwanted medical care, see id. at 2851, or in “safe-guarding the accuracy” of determining the person's wishes. Id. at 2871 (Brennan, J., dissenting).

. As Justice O’Connor observed in Cruzan,
[f]ew individuals provide explicit oral or written instructions regarding their intent to refuse medical treatment should they become incompetent. States which decline to consider any evidence other than such instructions may frequently fail to honor a patient’s intent. Such failures might be avoided if the State considered an equally probative source of evidence: the patient’s appointment of a proxy to make health care decisions on her behalf. Delegating the authority to make medical decisions to a family member or friend is becoming a common method of planning for the future. See, e.g., Areen, The Legal Status of Consent Obtained from Families of Adult Patients to Withhold or Withdraw Treatment, 258 JAMA 229, 230 (1987).
Cruzan, 110 S.Ct. at 2857 (O’Connor, J., concurring) (footnote omitted).

. As we noted earlier, when a decision-maker has not been designated, a close family member or friend may carry out the patient’s instructions.

. By certificates, we mean affidavits, sworn statements, or depositions. In re Guardianship of Browning, 543 So.2d 258, 272 (Fla. 2d DCA 1989).

. We request the Probate and Guardianship Committee of The Florida Bar to submit to the Court within six months a proposed rule establishing procedures for expedited judicial intervention as required herein. The experience of numerous patients who died during the course of burdensome litigation underscores the importance of rules that provide such patients with certain access to the courts and the ability to swiftly resolve their claims when nonlegal means prove unsuccessful. See, e.g., John F. Kennedy Memorial Hosp. v. Bludworth, 452 So.2d 921 (Fla.1984); In re Guardianship of Browning, 543 So.2d 258 (Fla. 2d DCA 1989); Corbett v. D’Alessandro, 487 So.2d 368 (Fla. 2d DCA), review denied, 492 So.2d 1331 (Fla.1986); Rasmussen ex rel. Mitchell v. Fleming, 154 Ariz. 207, 741 P.2d 674 (1987); Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977); In re Farrell, 108 N.J. 335, 529 A.2d 404 (1987); In re Conroy, 98 N.J. 321, 486 A.2d 1209 (1985); In re Storar, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266, cert. denied, 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981).