NORWOOD HOSPITAL *vs.* YOLANDA MUNOZ & another.[1]

Norfolk. October 3, 1990. - January 15, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Moot Question. Practice, Civil,* Moot case. *Medicine,* Withholding medical treatment. *Constitutional Law,* Right to refuse medical treatment, Privacy, Freedom of religion. *Privacy. Religion.*

This court undertook to answer a moot question with respect to a competent adult's refusal to accept life-saving medical treatment where the issue was one of public importance, capable of repeating itself while evading review. [120-121]

A competent adult has a common law and constitutional right to refuse a life-saving blood transfusion, based on the individual's rights to bodily integrity and privacy. [122-124]

In the circumstances of a case in which a hospital sought judicial authorization in a nonemergency situation to administer life-saving blood or blood products to a competent adult patient who had refused transfusions on religious grounds, where the the judge determined that the patient did not want to die, the State's interest in the prevention of suicide was not applicable as countervailing to the patient's right to refuse treatment. [125]

In the circumstances of a case in which a hospital sought judicial authorization in a nonemergency situation to administer life-saving blood or blood products to a competent adult patient who had refused transfusions on religious grounds, the State's interests in preserving the patient's life and in protecting the sanctity of life did not override the patient's right to forgo treatment. [125-126]

In the circumstances of a case in which a hospital sought judicial authorization in a nonemergency situation to administer life-saving blood or blood products to a competent adult patient who had refused transfusions on religious grounds, the State's interest in maintaining the ethical integrity of the medical profession did not outweigh the patient's right to refuse treatment. [126]

In the circumstances of a case in which a hospital sought judicial authorization in a nonemergency situation to administer life-saving blood or blood products to a competent adult patient who was the parent of a

[1]Ernesto Munoz, her husband.

minor child, the State's interest in protecting the welfare of the minor, in the absence of any compelling evidence that the child would be abandoned, did not outweigh the parent's right to refuse medical treatment. [127-131]

O'CONNOR, J., with whom NOLAN & LYNCH, JJ., joined, was of the view that a competent adult had the right to refuse a blood transfusion, if acceptance of a transfusion would violate tenets of her faith as a Jehovah's Witness.

CIVIL ACTION commenced in the Norfolk Division of the Probate and Family Court Department on April 12, 1989.

The case was heard by *David H. Kopelman*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John G. Dugan* for Yolanda Munoz.

*Jonathan Brant*, guardian ad litem.

*Andrew C. Pickett* for the plaintiff.

LIACOS, C.J. In this case, a competent adult, who is a Jehovah's Witness and a mother of a minor child, appeals from a judgment of the Probate and Family Court authorizing Norwood Hospital to administer blood or blood products without her consent.

We state the facts. Yolanda Munoz, a thirty-eight year old woman, lives in Dedham with her husband, Ernesto Munoz, and their minor son, Ernesto, Jr. Ernesto's father, who is over seventy-five years old, also lives in the same household.

Ms. Munoz has a history of stomach ulcers. Approximately ten years ago, she underwent surgery for a bleeding ulcer. On April 11, 1989, Ms. Munoz vomited blood and collapsed in her home. During the week before she collapsed, Ms. Munoz had taken two aspirin every four hours to alleviate a pain in her arm. The aspirin apparently made her ulcer bleed. Ernesto took his wife to the Norwood Hospital emergency room. Physicians at Norwood Hospital gave Ms. Munoz medication which stopped the bleeding. Ms. Munoz was then admitted to the hospital as an inpatient. During the evening, her hematocrit (the percentage of red blood cells to whole blood) was 17%. A normal hematocrit level for an

adult woman is approximately 42%. Ms. Munoz was placed under the care of Dr. Joseph L. Perrotto. It was his medical opinion that the patient had a 50% probability of hemorrhaging again. If Ms. Munoz started to bleed, Dr. Perrotto believed that she would in all probability die unless she received a blood transfusion. Ms. Munoz, however, refused to consent to a blood transfusion in the event of a new hemorrhage.

Ms. Munoz and her husband were baptized as Jehovah's Witnesses over sixteen years ago. They are both members of the Jamaica Plain Kingdom Hall of Jehovah's Witnesses. Ms. Munoz attends three religious meetings every week. A principal tenet of the Jehovah's Witnesses religion is a belief, based on interpretations of the Bible, that the act of receiving blood or blood products precludes an individual resurrection and everlasting life after death.

Norwood Hospital has a written policy regarding patients who refuse to consent to the administration of blood or blood products. According to this policy, if the patient arrives at the hospital in need of emergency medical treatment and there is no time to investigate the patient's circumstances or competence to make decisions regarding treatment, the blood transfusion will be performed if necessary to save the patient's life. If the patient, in a nonemergency situation, refuses to consent to a blood transfusion, and the patient is a competent adult, not pregnant, and does not have minor children, the hospital will accede to the patient's refusal. If the patient, in a nonemergency situation, refuses to consent to a blood transfusion, and the patient is a minor, an incompetent adult, pregnant, or a competent adult with minor children, the hospital's policy is to seek judicial determination of the rights and responsibilities of the parties.

The patient in this case, while no longer in an emergency situation once her ulcer stopped bleeding, has a minor child. The hospital sought a court order; on April 12, the hospital filed a complaint for a declaratory judgment in the Norfolk Division of the Probate and Family Court pursuant to G. L.

c. 231A (1988 ed.). The hospital requested that Ms. Munoz be required to accept blood transfusions which her attending physician believed to be reasonably necessary to save her life. On that same day, the judge granted a temporary restraining order authorizing the hospital to "administer transfusions of blood or blood products in the event that [the patient] hemorrhages to the extent that her life is severely threatened by loss of blood in the opinion of her attending physicians." The court also appointed Mr. Jonathan Brant to serve as guardian ad litem for five year old Ernesto, Jr.

On April 13, the judge held a full evidentiary hearing. Dr. Perrotto stated in an unchallenged affidavit that, if Ms. Munoz were to begin bleeding again, she would have an excellent chance of recovering if she received a blood transfusion. If she started to bleed, however, and did not receive a blood transfusion, she would probably die. In addition, Dr. Perrotto stated that there was no alternative course of medical treatment capable of saving the patient's life. Ernesto Munoz and James Joslin, Ms. Munoz's brother-in-law, testified at the hearing in favor of allowing Ms. Munoz to refuse the blood transfusion. The guardian ad litem's report, which recommended that the hospital's request for a declaratory judgment be denied, was admitted in evidence.

On April 14, the judge granted the declaratory judgment authorizing blood transfusions which were "reasonably necessary to save [the patient's] life." The judgment also absolved the hospital and its agents from any civil or criminal liability, except for negligence or malpractice, which might arise from a blood transfusion. On May 11, 1989, the judge issued a detailed opinion explaining his reasons for granting the declaratory judgment. The judge found the patient competent; she understood the nature of her illness, and the potential serious consequences of her decision, including the risk of imminent death if her bleeding resumed and blood transfusions were not administered. While recognizing that a competent adult may usually refuse medical treatment, the judge stated that the hospital could administer the blood transfusions because, if they did not and Ms. Munoz subse-

quently died, Ernesto, Jr., would be "abandoned." The judge concluded that the State's interest in protecting the well-being of Ernesto, Jr., outweighed Ms. Munoz's right to refuse the medical treatment.

In order further to understand the judge's reasoning, we need to discuss his factual findings in more detail. Ernesto works sixteen hours a day Monday through Friday and seven hours on Saturday driving his own commercial truck. Ms. Munoz works at a beauty salon from 9 A.M. to 3 P.M. three days a week. Ernesto, Jr., is enrolled in a day-care center Monday through Friday from 9 A.M. until 4 P.M. The judge found that Ms. Munoz was the "principal homemaker and principal caretaker of Ernesto, Jr." The judge also found that, while Ernesto's father was available to assist in caring for Ernesto, Jr., his assistance would be inadequate because of his advanced age, his inability to speak English, his unemployment, his lack of a driver's license, and because he had not, in the past, played a significant role in caring for his grandson. In addition, the judge found, that while Sonia and James Joslin, Ernesto's sister and brother-in-law, expressed a willingness to help Ernesto take care of the child in the event that Ms. Munoz died, the family had not formulated a concrete plan for the care and support of Ernesto, Jr. The judge concluded that Ms. Munoz's death "would be likely to cause an emotional abandonment of Ernesto, Jr., which would more probably than not be detrimental to his best interests." The judge ruled that "[t]he State, as parens patriae, will not allow a parent to abandon a child, and so it should not allow this most ultimate of voluntary abandonments."

Ms. Munoz argues that the judge erred because she has a right, as a competent adult, to refuse life-saving medical treatment, and the State's interests do not override that right. We agree.

I

*Mootness.* Ms. Munoz's ulcer did not hemorrhage after the entry of the judgment. She was released from the hospi-

tal without receiving a blood transfusion. The hospital argues that the case is moot.

We agree that the case is moot. There is no evidence in the record that Ms. Munoz's ulcer problems will recur, and, even if they do, there is no evidence that she intends to return to Norwood Hospital. The general rule is that courts ordinarily will not decide moot questions. There are, however, exceptions to the general rule. We have answered moot questions "where the issue was one of public importance, where it was fully argued on both sides, where the question was certain, or at least very likely, to arise again in similar factual circumstances, and especially where appellate review could not be obtained before the recurring question would again be moot." *Lockhart* v. *Attorney Gen.*, 390 Mass. 780, 783 (1984).

The instant case meets all the exceptions to the general rule. Whether a competent individual may refuse medical treatment is unquestionably an issue of public importance. In this case, the issue has been fully argued by both sides and is capable of repetition while evading review. See *Metros* v. *Secretary of the Commonwealth*, 396 Mass. 156, 159-160 (1985). Cases such as this one often arise in emergency situations; patients, physicians, and trial judges must make difficult decisions in very limited periods of time. By the time the cases reach the appellate courts, the issue is usually moot because the patients have either died or left the hospital without the need for further medical treatment. Due to the importance of the issue, and because of its proclivity to repeat itself while evading review, we proceed to address the merits.

II

We are asked to decide when a competent individual may refuse medical treatment which is necessary to save that individual's life. In *Brophy* v. *New England Sinai Hosp., Inc*, 398 Mass. 417 (1986), and in *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728 (1977), we were asked to decide the rights of incompetent patients to refuse

medical treatment.[2] In both cases we found it necessary to determine the rights of competent individuals to refuse medical treatment before we discussed the rights of incompetent patients. *Brophy, supra* at 429-432. *Saikewicz, supra* at 736-739.[3] In both cases we balanced an individual's right to refuse medical treatment against the State's interests in having the medical treatment imposed on the individual. *Brophy, supra* at 432. *Saikewicz, supra* at 741.

1. *The right to refuse treatment.* This court has recognized the right of a competent individual to refuse medical treatment. We have declared that individuals have a common law right to determine for themselves ·whether to allow a physical invasion of their bodies. See *Brophy, supra* at 430; *Harnish v. Children's Hosp. Medical Center,* 387 Mass. 152, 154 (1982); *Saikewicz, supra* at 738-739. See also G. L. c. 214, § 1B (statutory right of privacy). We have stated that "a person has a strong interest in being free from nonconsensual invasion of his bodily integrity." *Saikewicz, supra* at 739. Individuals also have a penumbral constitutional right of privacy to reject medical treatment. See *Roe* v. *Wade,* 410 U.S. 113 (1973); *Griswold* v. *Connecticut,* 381 U.S. 479 (1965); *Brophy, supra; Saikewicz, supra* at 739.

The right to bodily integrity has been developed further through the doctrine of informed consent, which this court

---

[2]In *Brophy, supra,* the patient was in a persistent vegetative state. The patient's family wished to remove a gastronomy tube which provided the patient with nutrition and hydration. *Id.* at 421-428. In *Saikewicz, supra,* the patient was a severely mentally retarded sixty-seven year old man who had leukemia. The patient's guardian ad litem recommended that the patient not be provided with chemotherapy treatment. The Probate Court reported the question whether it would be appropriate to withhold medical treatment from a person even though the withholding might contribute to a shortening of the person's life. *Id.* at 729-735.

[3]In both cases we applied the doctrine of "substituted judgment" in which an attempt is made to determine the decision "which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person." *Saikewicz, supra* at 752-753. See *Brophy, supra* at 433.

recognized in *Harnish* v. *Children's Hosp. Medical Center*, *supra*. Under the doctrine, a physician has the duty to disclose to a competent adult "sufficient information to enable the patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure." *Id.* at 154-155. It is for the individual to decide whether a particular medical treatment is in the individual's best interests. As a result, "[t]he law protects [a person's] right to make her own decision to accept or reject treatment, whether that decision is wise or unwise." *Lane* v. *Candura*, 6 Mass. App. Ct. 377, 383 (1978). See *Brophy, supra* at 430-431.

There is no doubt, therefore, that Ms. Munoz has a right to refuse the blood transfusion. Initially, it is for her to decide, after having been informed by the medical personnel of the risks involved in not accepting the blood transfusion, whether to consent to the medical treatment. The fact that the treatment involves life-saving procedures does not undermine Ms. Munoz's rights to bodily integrity and privacy, except to the extent that the right must then be balanced against the State's interests. See *Brophy, supra*; *Saikewicz, supra*; *Matter of Conroy*, 98 N.J. 321, 348 (1985).[4]

Ms. Munoz argues that, in addition to her rights to bodily integrity and privacy, she has a right secured by the free exercise clause of the First Amendment to the United States Constitution to object to the administration of blood or blood products because to consent to the blood transfusions would violate one of the principal tenets of her Jehovah's Witnesses faith. Some courts have recognized a free exercise right on the part of Jehovah's Witnesses to refuse blood transfusions. See *In re Estate of Brooks*, 32 Ill. 2d 361 (1965); *In re*

---

[4]We discuss the State's interests in section 2, *infra*.

Numerous courts have recognized the right of a competent individual to refuse medical treatment even if that decision will hasten death. See, e.g., *Matter of Farrell*, 108 N.J. 335 (1987); *Fosmire* v. *Nicoleau*, 75 N.Y.2d 218 (1990); *Bouvia* v. *Superior Court*, 179 Cal. App. 3d 1127 (1986); *Bartling* v. *Superior Court*, 163 Cal. App. 3d 186 (1984); *Satz* v. *Perlmutter*, 362 So. 2d 160 (Fla. Dist. Ct. App. 1978), aff'd, 379 So. 2d 359 (Fla. 1980).

*Brown*, 478 So. 2d 1033 (Miss. 1985). We do not think it is
necessary, however, to decide whether Ms. Munoz has a free
exercise right to refuse the administration of blood or blood
products, since we have already held that she has a common
law and constitutional privacy right to refuse a blood trans-
fusion. Also, we need not decide whether a patient's right is
strengthened because the objection to the medical treatment
is based on religious principles.[5]

---

[5]The New York Court of Appeals reached a similar conclusion in *Fos-
mire* v. *Nicoleau, supra.* The court refused to consider whether the consti-
tutional rights of a Jehovah's Witness, who refused blood transfusions,
were violated when the lower court ordered that the transfusion be admin-
istered. The court refused to reach the constitutional issues since it held
that the patient had a common law and statutory right to decline the blood
transfusion. *Id.* at 225.

Justice O'Connor (joined by Justices Nolan and Lynch) concurs, based
solely on Ms. Munoz's religious argument. The separate opinion states that
*Brophy* v. *New England Sinai Hosp., Inc.,* 398 Mass. 417 (1986), and the
instant case endorse suicide. *Post* at 132. We reject this claim. Competent
adults have the right to decide for themselves whether to refuse medical
treatment. This principle was reaffirmed by the concurring Justice when he
wrote for the court: "Every competent adult has a right 'to forego treat-
ment, or even cure, if it entails what for him are intolerable consequences
or risks however unwise his sense of values may be in the eyes of the medi-
cal profession.' " *Harnish* v. *Children's Hosp. Medical Center,* 387 Mass.
152, 154 (1982), quoting *Wilkinson* v. *Vesey,* 110 R.I. 606, 624 (1972).

In *Brophy*, we stated the obvious point that the law does not permit
suicide. *Brophy, supra* at 434 n.29. We also stated that "declining life-
sustaining medical treatment may not properly be viewed as an attempt to
commit suicide. Refusing medical intervention merely allows the disease to
take its natural course; if death were eventually to occur, it would be the
result, primarily, of the underlying disease, and not the result of a self-
inflicted injury." *Id.* at 439, quoting *Matter of Conroy,* 98 N.J. 321, 350-
351 (1985). "Suicide is the termination of one's own life by act or omission
with the *specific intention* to do so" (emphasis supplied). *Brophy, supra* at
450 (O'Connor, J., concurring in part and dissenting in part). The judge in
the instant case found that Ms. Munoz "does not wish to die." It is diffi-
cult to understand how the court's decision endorses suicide in the absence
of any evidence that Ms. Munoz wanted to die. There is a clear distinction
between respecting the right of individuals to decide for themselves
whether to refuse medical treatment and endorsing the idea that it is ac-
ceptable for individuals to take their own lives.

The suggestion that Ms. Munoz's right to refuse medical treatment
arises from, and depends on, her particular religious beliefs is troubling.
See *post* at 132 (O'Connor, J., concurring) ("I subscribe to the result
reached by the court only because I believe that Munoz indeed has a right,

2. *The State's interests.* The right to refuse medical treatment in life-threatening situations is not absolute. *Brophy*, *supra* at 432. *Commissioner of Correction* v. *Myers*, 379 Mass. 255, 261-262 (1979). We have recognized four countervailing interests: (1) the preservation of life; (2) the prevention of suicide; (3) the maintenance of the ethical integrity of the medical profession; and (4) the protection of innocent third parties. *Brophy*, *supra*. *Saikewicz*, *supra* at 741.

The judge determined that the patient did not want to die. Declining potentially life-saving treatment may not be viewed properly as an attempt to commit suicide. *Saikewicz*, *supra* at 743 n.11. *Matter of Conroy*, *supra* at 350-351. See Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L. Rev. 1, 16-17 (1975). Therefore, it is clear that the second interest listed above does not apply in this case. We proceed to discuss the other three interests.

a. *The preservation of life.* The State has an interest in preserving life, especially in a case such as the present one where the patient's affliction is curable. See *Brophy*, *supra* at 433; *Saikewicz*, *supra* at 741-742. The State's interest in preserving life has "two separate but related concerns: an interest in preserving the life of the particular patient, and an interest in preserving the sanctity of all life." *Matter of Conroy*, *supra* at 349. As to the former, the State's concern is weakened when the decision maker (the individual who refuses to consent to the treatment) is also the patient "because the life that the state is seeking to protect in such a situation

---

which ought to be recognized and respected, to risk death, if she deems that necessary, to preserve her immortal soul"). The right of a competent individual to refuse medical treatment and to be free from nonconsensual invasion of his or her bodily integrity, *supra* at 122-124, exists irrespective of that individual's religious beliefs. The application of a rule which would allow a patient to refuse life-saving medical treatment depending on the presence (or absence) of particular religious beliefs (such as, for example, the belief in the immortality of the soul and everlasting life after death), would necessarily involve making a judgment as to which religious beliefs deserve protection; such a judgment, when made by courts, would not only be impractical but also dangerous.

is the life of the same person who has competently decided to forgo the medical intervention; it is not some other actual or potential life that cannot adequately protect itself." *Id.* In cases where a competent adult refuses medical treatment for herself, the State's interest in preserving the particular patient's life will not override the individual's decision. See *Fosmire* v. *Nicoleau*, 75 N.Y.2d 218, 227 (1990).

The second concept within the State's interest in the preservation of life is the more abstract notion of protecting the sanctity of life. In determining whether this concept applies, we must keep in mind that the right to privacy is an "expression of the sanctity of individual free choice and self-determination as fundamental constituents of life. The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice." *Saikewicz, supra* at 742. "The duty of the State to preserve life must encompass a recognition of an individual's right to avoid circumstances in which the individual [herself] would feel that efforts to sustain life demean or degrade [her] humanity." *Brophy, supra* at 434. See *Matter of Conroy, supra* at 350. See also *Public Health Trust of Dade County* v. *Wons*, 541 So. 2d 96, 100 (Fla. 1989) (Ehrlich, C.J., concurring specially); Cantor, A Patient's Decision to Decline Life-Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life, 26 Rutgers L. Rev. 228, 243-245, 263 (1973).

In this case, the patient, a fully competent adult, determined for herself that she could not consent to the administration of blood or blood products because to do so would violate a sacred religious belief. The patient decided that she would rather risk death than accept the blood transfusion. We can assume that, for this patient, death without receiving a blood transfusion is preferable to life after receiving the transfusion. The quality and integrity of this patient's life after a blood transfusion would be diminished in her view. Therefore, we conclude that the State's interest in protecting the sanctity of life must give way to the patient's decision to forgo treatment.

b. *Ethical integrity of the medical profession.* The State has an interest in maintaining the ethical integrity of the medical profession by giving hospitals and their staffs a full opportunity to assist those in their care. *Custody of a Minor*, 375 Mass. 733, 755 (1978). *Saikewicz, supra* at 743. However, we have stated that "so long as we decline to force the hospital to participate . . . there is no violation of the integrity of the medical profession." *Brophy, supra* at 439. We have recognized that medical ethics do not require that a patient's life be preserved in all circumstances. See *Brophy, supra* at 439-440; *Saikewicz, supra* at 743-744. Last, the ethical integrity of the profession is not threatened by allowing competent patients to decide for themselves whether a particular medical treatment is in their best interests. *Matter of Conroy, supra* at 352. "[I]f the doctrines of informed consent and right of privacy have as their foundations the right to bodily integrity . . . and control of one's own fate, then those rights are superior to the institutional considerations [of hospitals and their medical staffs]" (citation omitted). *Saikewicz, supra* at 744.[6] In the circumstances of this case, the State's interest in maintaining the ethical integrity of the profession does not outweigh the patient's right to refuse blood transfusions.

c. *Protection of third parties.* The final, and in this case the most compelling, State interest is the protection of the patient's minor child. The State as parens patriae has an interest in protecting the well-being of children. See *Prince* v. *Massachusetts*, 321 U.S. 158, 166-167 (1944). The issue is

---

[6]The New Jersey Supreme Court has stated that "even if doctors were exhorted to attempt to cure or sustain their patients under all circumstances, that moral and professional imperative, at least in cases of patients who were clearly competent, presumably would not require doctors to go beyond advising the patient of the risks of foregoing treatment and urging the patient to accept the medical intervention. . . . If the patient rejected the doctor's advice, the onus of that decision would rest on the patient, not the doctor. Indeed, if the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole." (Citations omitted.) *Matter of Conroy, supra* at 352-353.

whether a competent adult can be prevented from exercising her right to refuse life-saving medical treatment because of the individual's duties to her child.

The Florida State courts recently have addressed this issue. See *Wons* v. *Public Health Trust of Dade County*, 500 So. 2d 679 (Fla. Dist. Ct. App. 1987), aff'd, 541 So. 2d 96 (Fla. 1989). The patient in *Wons* was a thirty-eight year old woman, mother of two minor children, who suffered from dysfunctional uterine bleeding. The patient's physicians informed her that she required treatment in the form of blood transfusions. The patient, however, refused to consent to the transfusions because of her beliefs as a Jehovah's Witness. It was the physicians' medical opinion that, if the patient did not consent to the blood transfusions, she would probably die. The trial judge granted an order authorizing the transfusion, but a Florida District Court of Appeals reversed, holding that the State's interest in protecting the patient's children did not override the patient's right to refuse the medical treatment because the patient's possible death would not result in the abandonment of her two children. *Wons* v. *Public Health Trust of Dade County*, 500 So. 2d at 688. As the court pointed out, the testimony showed that the patient came from a tightly knit family, all practicing Jehovah's Witnesses, and all of whom supported her decision to refuse the blood transfusion. *Id.* The court also pointed out that the patient's husband and mother were willing to take care of the children in the event that the patient died. *Id.* The court concluded that "there is no showing of an abandonment of minor children, and, consequently, [the patient's] constitutional right to refuse a blood transfusion is not overridden under the circumstances of this case." *Id.*

In *Fosmire* v. *Nicoleau*, 75 N.Y.2d 218 (1990), the New York Court of Appeals apparently has held that the State's interest in protecting minor children will never be allowed to override the right of a competent individual to refuse medical treatment. The court explained that "at common law the patient's right to decide the course of his or her own medical

treatment was not conditioned on the patient['s] being without minor children or dependents." *Id.* at 229-230.

We need only state that we agree with the reasoning of the Florida court, and hold that, in the absence of any compelling evidence that the child will be abandoned, the State's interest in protecting the well-being of children does not outweigh the right of a fully competent adult to refuse medical treatment. Our review of the record in this case reveals no such compelling evidence.[7] The evidence shows that Ernesto Munoz supported his wife's decision not to consent to the blood transfusion. There is no evidence in the record that Ernesto was unwilling to take care of the child in the event that Ms. Munoz died.[8] We note that the father has the financial resources to take care of the child and to make sure that the child's material needs are satisfied.[9] We also note that Ernesto's sister and brother-in-law supported Ms. Munoz's de-

---

[7]The case most often cited in support of the proposition that the State's interest in protecting the well-being of the patient's children outweighs the patient's right to refuse life-saving treatment is *Application of the President & Directors of Georgetown College, Inc.*, 331 F.2d 1000 (D.C. Cir), cert. denied, 377 U.S. 978 (1964). In that case, however, unlike the case before us, the patient was not competent to decide for herself whether to consent to the blood transfusion. The court stated that the patient was as "little able competently to decide for herself as any child would be. Under the circumstances, it may well be the duty of a court . . . to assume the responsibility of guardianship for her, as for a child, at least to the extent of authorizing treatment to save her life" (footnote omitted). *Id* at 1008.

[8]A commentator's criticism of *Application of the President & Directors of Georgetown College, Inc., supra,* is relevant: "[T]he refusal of [the patient's] husband to authorize the transfusion indicates that he acceded to her wishes even though they might result in leaving the child motherless. It would not seem that one parent should be found guilty of child abandonment in a situation where the other parent has agreed to her leaving and, presumably, to provide for the child alone." Case Comment, Constitutional Law — Transfusions Ordered for Dying Woman over Religious Objections, 113 U. Pa. L. Rev. 290, 294 (1964). See *Matter of Farrell*, 108 N.J. 335, 352-353 (1987) (mother's right to refuse treatment upheld where "father's capacity to care for [the children] in her absence is unquestioned").

[9]According to the judge's findings, Ernesto earns approximately $1,800 a week or $93,600 a year, driving his own commercial truck. Ms. Munoz earns approximately $5,200 a year working part-time in a beauty salon. The couple pays $900 a month in mortgage payments and $1,192 a month to pay for a loan taken out when they purchased the truck. If Ms. Munoz

cision, and were willing to assist Ernesto in taking care of the child.[10]

There can also be no doubt that, if Ms. Munoz had died, the entire family, including the young child, would have suffered a great loss. However, the State does not have an interest in maintaining a two-parent household in the absence of compelling evidence that the child will be abandoned if he is left under the care of a one-parent household.[11] "The parens patriae doctrine invoked herein cannot, we think, measure increments of love; it cannot mandate a two-parent, rather than a one-parent, family; it is solely concerned with seeing that minor children are cared for and are not abandoned." *Wons* v. *Public Health Trust of Dade County*, 500 So. 2d at 688. In these circumstances the State's interest in protecting the welfare of the patient's child does not outweigh her right to refuse the blood transfusions.

3. *Conclusion.* The patient had the right to refuse to consent to the blood transfusion even though she would have in all probability died if she had started to hemorrhage. The State's interests in preserving the patient's life, in maintaining the ethical integrity of the profession, and in protecting

---

were to die, Ernesto would receive $50,000 in life insurance proceeds, which is approximately the unpaid balance on the truck loan.

[10]The judge, while stating that the sister and the brother-in-law had the good intentions of helping in the care of the child, concluded that no "concrete plan has been formulated for the care and support of Ernesto, Jr." The evidentiary hearing, however, was held only twenty-four hours after the hospital requested the declaratory judgment. It is not surprising, therefore, that the family had not formulated a "concrete plan." We think it is sufficient that, at the time the evidentiary hearing was held, there were family members who supported the patient's decision to forgo the medical treatment, and who were willing to assist in taking care of the child in the event that the patient died.

[11]The judge found that, if Ms. Munoz died, the child would "suffer an emotional abandonment or void." The judge concluded that the State "should not allow this most ultimate of voluntary abandonments." Every child who loses a mother, however, suffers emotionally. Emotional suffering by a child is not sufficient, by itself, to override the rights of a competent adult to refuse medical treatment, at least in cases where there is evidence that the father and other members of the family are willing to take care of the child.

the well-being of the patient's child, did not override the patient's right to refuse life-saving medical treatment. Accordingly, the judgment is reversed and a new judgment declaring the rights of the parties, consistent with this opinion, is to be entered in the Probate Court.

*So ordered.*

O'CONNOR, J. (concurring, with whom Nolan and Lynch, JJ., join). I agree that the judgment should be reversed and that the Probate and Family Court should enter a new judgment declaring that, in the event of a new hemorrhage, Yolanda Munoz (Munoz) has a right to refuse blood transfusions, and that that right must be respected by medical personnel and all others. Critical to my thinking, however, unlike the thinking of the court, is that Munoz's withholding of consent to transfusion is based on her belief that her acceptance of transfusions might preclude her from resurrection and everlasting life after death. That is the sole reason that Munoz would risk death rather than accept blood from another. Munoz, the judge found, does not want to die. Those facts lead me to agree with the result reached by the court. However, I cannot subscribe to an opinion that endorses, as I believe this opinion does, a right to assisted suicide.

In *Brophy* v. *New England Sinai Hosp., Inc.*, 398 Mass. 417 (1986), the case on which the court primarily relies, the trial judge found that, if Brophy had been competent, he would have chosen to decline the provision of food and water through a gastrointestinal tube, not because that procedure would be ineffective in prolonging his life and not because the procedure would be painful or humiliating, but because, given the circumstances, Brophy would rather be dead than alive. In that context, this court held that Brophy's interest in self-determination was greater than the State's interest in the preservation of life. Three dissenting Justices, including

me, characterized the court's decision as an unacceptable endorsement of suicide.

In this case, the court takes pains to say that its decision is not influenced by the fact that Munoz's refusal to accept transfusions is grounded on religious belief or concern about salvation. Rather, relying largely on the *Brophy* case, the court concludes that Munoz's right of self-determination, without reference to her concern about the hereafter or any other motive, is superior to any countervailing State interest. In the absence of a necessity to protect innocent third parties, a necessity which I agree is not present in this case, the court concludes that, "[i]n cases where a competent adult refuses medical treatment for herself, the State's interest in preserving the particular patient's life will not override the individual's decision." *Ante* at 126. That is to say, as the court said in *Brophy*, that, apart from possible countervailing interests of innocent third parties, a competent adult, and presumably an incompetent adult pursuant to substituted judgment, may reject any and every form of life-prolonging assistance for any reason whatsoever including disenchantment with life, and that that choice takes precedence over the State's interest both in preserving the individual's life and in promoting the sanctity of all human life. I write separately to disassociate myself from any such thesis. I subscribe to the result reached by the court only because I believe that Munoz indeed has a right, which ought to be recognized and respected, to risk death, if she deems that necessary, to preserve her immortal soul.[1]

---

[1]The court responds in footnote 5 to my concurring opinion. Footnote 5, too, deserves a response.

As I have stated, in *Brophy* the trial judge found that Brophy's primary purpose in declining food and water would have been to end his life. Brophy's specific intention, then, attributed to him by a process of substituted judgment, was to terminate his life by the act or omission for which the court's approval was sought and given. The court was bound by the trial judge's findings. The court endorsed Brophy's suicide and the conduct of those who assisted it despite the court's contrary claim in *Brophy*, *supra* at 434 n.29 and again here that it did not do so.

The court points to my statement as the author of the court's opinion in *Harnish* v. *Children's Hosp. Medical Center*, 387 Mass. 152, 154 (1982),

in which I quoted with approval from the case of *Wilkinson* v. *Vesey*, 110 R.I. 606, 624 (1972), as follows: "Every competent adult has a right 'to forego treatment, or even cure, if it entails what for him are intolerable consequences or risks however unwise his sense of values may be in the eyes of the medical profession.' " As any fair reading of *Harnish* would disclose, and as I was careful to say in my separate opinion in *Brophy*, *supra* at 450, "[t]he court's explicit recognition of an individual's right to be free of nonconsensual invasion of his bodily integrity in *Harnish* . . . in no sense implied recognition of a right to commit suicide." In *Harnish*, the concern to which the quoted statement was addressed was a patient's right to adequate information about risks and potential benefits to enable her to make an intelligent decision about whether to undergo elective surgery.

The court states, "It is difficult to understand how the court's decision endorses suicide in the absence of any evidence that Ms. Munoz wanted to die." *Ante* at 124 n.5. There should be no difficulty. It is clear from the court's opinion that the court is not influenced in the slightest by the absence of evidence that Munoz wanted to die. If there were such evidence, the court's result would be no different. The court makes clear that Munoz's right to forgo blood transfusions was absolute, and that her purpose was exclusively her business and was irrelevant to the court's holding. In similar fashion, the judge's finding in the *Brophy* case that Brophy's primary objective would have been to end his life did not deter the court from holding that removal of the feeding tube was permissible.

The court characterizes as "troubling" a perceived suggestion in my concurring opinion "that Ms. Munoz's right to refuse medical treatment arises from, and depends on, her particular religious beliefs." *Ante* at 124 n.5. The court's perception is entirely unwarranted, as is its concern that my "suggestion" would require courts to decide which religious beliefs deserve protection. My concurring opinion says no such thing explicitly or implicitly. The obvious message delivered by the concurring opinion is that the State's interest in preserving individual human lives and in promoting the sanctity of all human life must take precedence over an individual's desire to terminate his or her life, whether by commission or omission, but the State's interests must give way to the choice of an individual, whether grounded in one religion or another or without reference to religion, as to how best to live.