SUPERIOR COURT 
 
 LAURIE ARRIA, Administratrix of the Estate of MICHAEL J. RAMEY v. CORRECT CARE SOLUTIONS, LLC, WELLPATH, LLC, COMMONWEALTH OF MASSACHUSETTS, DAVID A. ANDREWES, M.D., KATHERINE VAN ZANDT, NP, VHS ACQUISITION SUBSIDIARY NUMBER 7 d/b/a ST. VINCENT’S HOSPITAL

 
 Docket:
 1984CV2843-C
 
 
 Dates:
 February 6, 2024
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON ST. VINCENT HOSPITAL
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
 
 

             The Court has reviewed the summary judgment record summarized in the parties’ Rule 9A(B)(5) Statement of Material Facts, and concludes that the undisputed evidence permits no reasonable finding of negligence on the part of St. Vincent Hospital (“SVH”) or either of the two hospital physicians (Praveen Devineni, M.D. and Venababu Kandimalla, M.D.) who treated Michael Ramey (“Mr. Ramey”) in September of 2016. Summary judgment, therefore, shall enter on the negligence claims asserted against these Defendants.
FACTUAL BACKGROUND
            The gravamen of Plaintiff’s claim against the SVH Defendants is the charge that these doctors failed to timely diagnose and treat Mr. Ramey’s cryptococcal meningitis, resulting in this           
                                                            -1-
patient’s death. The uncontested facts of record, however, demonstrate that a lumbar puncture would have been diagnostic of cryptococcal meningitis, and that Mr. Ramey – while fully competent to make medical decisions concerning his care and treatment – rebuffed the persistent entreaties of his physicians that he consent to such a procedure. Thus, Mr. Ramey entered SVH on September 7, 2016, complaining of head trauma, pain, visual and hearing loss, and numbness. After a neurological consult and brain MRI on September 8 failed to disclose the cause of Mr. Ramey’s symptoms, a battery of SVH doctors began a concerted and sustained effort to have this patient consent to a lumbar puncture.      
            Neurologist Martha Fehr first provisionally recommended the lumbar puncture procedure on September 8, contingent on the results of a pending brain scan. When Mr. Ramey’s MRI disclosed no significant abnormalities, Defendant Dr. Devineni admitted him to a hospital floor for observation on September 9, and ordered the lumbar puncture that had been recommended by Dr. Fehr. Thereafter, beginning on September 10, Defendant Dr. Kandimalla repeatedly sought Mr. Ramey’s consent to undergo the recommended lumbar puncture. Dr. Kandimalla explained that this procedure would allow Mr. Ramey’s doctors to examine his cerebral spinal fluid to help determine what was wrong with him. Dr. Kandimalla further explained how the procedure was performed, advised Mr. Ramey of its risks, and gave assurances (in response to the patient’s stated concerns about pain) that any headaches or other discomforts that resulted from the procedure would be well managed with medication. After initially agreeing to the lumbar puncture, however, Mr. Ramey withheld the consent required for same in the face of continual urging from his treating providers that he submit to the procedure.      
            SVH records reflect that Dr. Kandimalla repeatedly attempted to convince Mr. Ramey of the critical importance of the lumbar puncture to a diagnosis of his condition, and made
                                                            -2-
numerous attempts to secure his consent for the procedure. All such attempts were spurned by the patient, who expressed concerns about pain. Specifically, Dr. Kandimalla and his team made repeated requests to perform the lumbar puncture on September 10, all of which Mr. Ramey rejected. Dr. Kandimalla and the medical team renewed these requests on several occasions throughout the day on September 11, but were once again met with refusals by Mr. Ramey. Dr. Kandimalla and his resident physician, Dr. John, made further attempts on September 12 to obtain Mr. Ramey’s patient authorization for a lumbar puncture, but on each occasion were rebuffed.     
            Frustrated by Mr. Ramey’s intransigence, Dr. Kandimalla sought and procured a psychological consult from an SVH psychiatrist, Dr. Cooper, evidently hoping for a finding that this patient lacked the mental capacity to give or refuse consent to a diagnostic procedure he needed. Dr. Cooper, however, evaluated Mr. Ramey and concluded that he was fully competent to make his own consent determinations.      
            On September 13, Dr. Fehr, Mr. Ramey’s treating neurologist, examined this patient again and reiterated the recommendation that he consent to a diagnostic lumbar puncture. Mr. Ramey once again refused. But when Mr. Ramey’s condition took a turn for the worse on September 14, Dr. Haney-Tilton of SVH’s Ophthalmology service urged that a lumbar puncture was necessary to rule out a dangerous infectious process. On this occasion, therefore, an emergency consent to the procedure was pursued by Dr. Fehr and secured from the superintendent of the jail where Mr. Ramey was resident.      
            Dr. Fehr performed the lumbar puncture on the afternoon of September 14, and Mr. Ramey was thereafter started on a regimen of medications to treat cryptococcal meningitis.
                                                            -3-
Unfortunately, the delay in diagnosis and treatment described above proved fatal. Mr. Ramey went into arrest in the early morning hours of September 15, and died on September 16, 2016.     
            In all, no fewer than five different physicians pressed Mr. Ramey to undergo a lumbar puncture that would – and ultimately did – reveal the cryptococcal meningitis that took his life. Mr. Ramey, however, implacably refused to consent to the recommended procedure – not once or twice, but multiple times each day over a five-day period. The SVH doctors only overcame Mr. Ramey’s resistance some six days after his admission to the hospital, when they secured emergency consent through correctional facility officials. The SVH Defendants’ persistent efforts to perform a lumbar puncture on Mr. Ramey is hardly the portrait of callous indifference Plaintiff would paint.
DISCUSSION
            A plaintiff alleging medical malpractice bears the burden to prove that the defendant physician breached the applicable standard of care and thereby caused the patient’s injuries. Palandjian v. Foster, 446 Mass. 100, 104 (2006). Barring exceptional circumstances (not present here), a plaintiff must establish these elements through expert medical opinion, Lane v. Winchester Hosp., 101 Mass. App. Ct. 74, 78 n.6 (2022), and that opinion “must be rooted in the record evidence and not be based on speculation, conjecture, or assumptions not supported by the evidence.” Washington v. Cranmer, 86 Mass. App. Ct. 674, 675 (2014), citing Blood v. Lea, 403 Mass. 430, 434 (1988). See also Shea v. Williams, No. 11-P-1996, 2012 WL 4477643, at *1 (Mass. App. Ct. Oct. 1, 2012) (Rule 1:28) (“[The plaintiff’s] malpractice claim required expert testimony — grounded in facts, not speculation — establishing a causal connection between the particular defendant's negligence and [the patient’s] injury.”).
                                                            -4-
            In the lone expert report that ascribes negligence to SVH and Drs. Devineni and Kandimalla, Steven Aronin, M.D. offers the opinion that the SVH physicians who treated Mr. Ramey displayed “a lack of determination to obtain the consent for the lumbar puncture.” Dr. Aronin thus asserts that the record “does not reveal a substantive, determined, urgent, and coordinated effort to fully inform the patient and to obtain his consent …. There is nothing in the record recounting explanation to Mr. Ramey of the importance of having the procedure or describing any give and take between him and his treating neurologist ….” Finally, Dr. Aronin criticizes Mr. Ramey’s medical providers for acknowledging in a couple of places in the record that the patient might be “malingering,” and suggesting that his persistent refusal to approve a lumbar puncture that might disclose the source of his claimed pain might leave no alternative but to discharge him. The Court acknowledges that the particular vocabulary adopted by this expert charges an indifference on the part of Mr. Ramey’s doctors that is inconsistent with the standard of care; but there is no evidence in the summary judgment record that is in fact substantially probative of this opinion.      
            The medical records themselves bear witness to a sustained, multi-day effort on the part of this patient’s providers to persuade Mr. Ramey to authorize a lumbar puncture. Faced with this welter of evidence, Dr. Aronin nevertheless argues that the medical records fail to reflect any “sense of urgency” in seeking consent for the lumbar puncture that Mr. Ramey’s dire circumstances required. The Court does not agree that this is a fair, reasonable, or even permissible construction of the evidence. Medical records are neither verbatim transcripts nor cinematic screenplays. They do not exist to memorialize either the complete dialogue (the “give and take”) between doctor and patient, or the emotional register (the “determined, urgent” tone) with which particular treatment recommendations are made. Medical records, rather, are   
                                                            -5-
prepared in tight timeframes and often under stressful circumstances by physicians confronted with many competing demands by patients in need. These records exist to document what treatment providers observed, thought, and did with respect to their patients in real time, in order to ensure that other practitioners who might be called upon to furnish care to the patient thereafter have the benefit of the most current, critical and comprehensive information about his condition. See 243 C.M.R. § 2.07(13)(a) (“A [physician] shall maintain a medical record for each patient that is complete, timely, legible, and adequate to enable the [physician] or any other health care provider to provide proper diagnosis and treatment.”). The purpose of the medical record is not to provide a platform for dramatic narrative in the manner of nighttime television; and Dr. Aronin’s inference of a lack of care for Mr. Ramey because the SVH doctors treating him failed to include such details in their patient notes is simply unsupportable.[1]      
            It is well settled in Massachusetts that every patient who (like Mr. Ramey) is mentally competent “has a right to forgo treatment, or even cure, if it entails what for him are intolerable consequences or risks[,] however unwise his sense of values may be in the eyes of the medical profession.” Commonwealth v. Pugh, 462 Mass. 482, 503 (2012) (quotation omitted). This right is borne of a patient’s compelling constitutional interests in privacy and bodily integrity. See Brophy v. New England Sinai Hospital, Inc., 398 Mass. 417, 430 (1986) (“The right of a patient
 
--------------------------------------------
 
[1] Sound policy reasons further counsel against expecting or encouraging physicians to lace patient records with the kind of theatrical and self-laudatory details (beyond the facts essential to treatment) that Dr. Aronin would require in order to dispel a post-hoc suggestion of indifference. Neither the healthcare community nor the public at large has any interest in motivating doctors to use their scarce time chronicling gratuitous information in medical charts, in the interest of self-preservation rather than quality of care – time that might otherwise be spent seeing and treating patients. See Committee on Quality of Health Care in America, Inst. of Med., “Crossing the Quality Chasm: A New Health System for the 21st Century,” at 6 (2001) (“All health care organizations, professional groups, [etc.] … should pursue six major aims; specifically, health care should be safe, effective, patient-centered, timely, efficient, and equitable.”). In this connection, the undersigned takes judicial notice that there is not a physician in the land prepared to say that the key to improving the quality of healthcare is to require that doctors spend more time with their charts and less with their patients. Perhaps more to the point, incentivizing physicians to infuse their charted patient notes with more extensive narrative will inevitably balloon the size of already ponderous medical records – making it more difficult for other busy doctors to extract the information they require, and more likely that important details will get overlooked in a sea of words.
                                                            -6-
to refuse medical treatment arises both from the common law and the unwritten and penumbral constitutional right to privacy,” and “[t]he common law’s implicit recognition that a person has a strong interest in being free from nonconsensual invasion of his bodily integrity is now explicit in this Commonwealth.”) (citations and quotations omitted). Accord Norwood Hospital v. Munoz, 409 Mass. 116, 123 (1991) (“the law protects a person’s right to make her own decision to accept or reject treatment, whether that decision is wise or unwise”) (citation and quotation omitted). A “[k]nowing exercise of this right requires knowledge of the available options and the risks attendant on each.” Harnish v. Children’s Hosp. Med. Ctr., 387 Mass. 152, 154 (1982). Thus, “a physician has the duty to disclose to a competent adult ‘sufficient information to enable the patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure.’” Norwood, 409 Mass. at 123 (1991), quoting Harnish, 387 Mass. at 154-55. Thereafter, “[i]t is for the individual to decide whether a particular medical treatment is in [his] best interests.” Norwood, 409 Mass. at 123.     
            In the case at bar, what the medical records show with unmistakable clarity is that no fewer than five different SVH doctors urged Mr. Ramey to consent to a lumbar puncture. Not once, but multiple times a day over a five-day period. In so doing, these physicians conveyed to Mr. Ramey the necessity of the lumbar puncture to properly diagnose his condition, and at least implied the danger of forgoing the procedure.[2] Dr. Kandimalla herself, in turn, has testified without contradiction to her insistent and increasing efforts undertaken to procure patient consent to this procedure, only to be met with corresponding intransigence on the part of Mr. Ramey. When such intransigence persisted, Mr. Ramey’s providers pursued alternate legal pathways to
 
--------------------------------------------
 
[2] It bears emphasis in this regard that what Mr. Ramey was spurning here was a diagnostic rather than life-saving procedure. The doctors who treated this patient had no informed basis upon which to caution him that he faced imminent death without it.
                                                            -7-
secure the necessary consent – first, by performing a psychiatric evaluation in an attempt to override Mr. Ramey’s refusals on competency grounds, and, when that failed, by seeking and securing emergency authorization for the procedure from the jail’s superintendent.       
            These are the unrefuted facts of what transpired in this case and, no matter how generously construed in favor of the Plaintiff, they belie rather than support the charge of physician indifference levelled by Dr. Aronin. Dr. Aronin avers that the SVH physicians should somehow have done more to obtain Mr. Ramey’s consent to a lumbar puncture, based on nothing more than speculation regarding the purportedly non-urgent tenor of the treating doctors’ communications with Mr. Ramey. But in resting his entire opinion on a negative implication drawn from the failure of the medical records to describe the actual words and tone used with this patient, Dr. Aronin supplies no reasonable factual basis upon which a fair-minded jury could find negligence on the part of the SVH Defendants. See Shea, 2012 WL 4477643 at *1 (affirming summary judgment for defendants where opinion of plaintiff’s medical expert that defendants deviated from standard of care failed to provide any factually-based causal connection between alleged negligent treatment and harm to patient). Once again, and to the precise contrary, Dr. Aronin’s conjectural opinion flies directly in the face of the first-hand testimony of Dr. Kandimalla and the documentary evidence contained in the patient medical record.      
            As for the suggestion referenced in a couple of the provider notes that this patient might be “malingering,” such a notion hardly offends common sense. Mr. Ramey, a prison inmate, was complaining of idiopathic pain and receiving strong opioid medication to manage it. At the same time, however, Mr. Ramey was refusing to consent to a diagnostic procedure that five different doctors repeatedly told him he needed. Malingering clearly could not be ruled out in these
                                                            -8-
circumstances; and the doctors were not unreasonable in suggesting that Mr. Ramey might have to be discharged if he continued to thwart their efforts to treat him. Withal, the mere consideration of this possibility has not been shown to have influenced Mr. Ramey’s actual care in any way. What the uncontroverted evidence shows instead is that Mr. Ramey’s condition worsened not because he failed to receive good care, but because he refused to accept it.      
            The laws of the Commonwealth do not enact a Hobson’s choice – where providers must risk either a medical malpractice claim for honoring a patient’s rights, or a medical battery claim for proceeding with a treatment over the patient’s objections. See Zaleskas v. Brigham & Women’s Hosp., 97 Mass. App. Ct. 55, 62 (2020) (medical treatment of competent patient without informed consent constitutes battery). If a patient’s right to bodily integrity “is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole.” Norwood, 409 Mass. at 127 n.6, quoting Matter of Conroy, 98 N.J. 321, 352-353 (1985). Perforce, when “the patient reject[s] the doctor’s advice, the onus of that decision [ ] rest[s] on the patient, not the doctor (emphasis added).” Norwood, 409 Mass. at 127 n.6, quoting Conroy, 98 N.J. at 352 (1985). In the present case, therefore, no proper finding of medical negligence on the part of the SVH Defendants can rest on their failure to overcome – despite persistent efforts – the insistence by Mr. Ramey that this constitutional right be honored.
CONCLUSION AND ORDER
            For the foregoing reasons, summary judgment shall enter against the claims of medical negligence asserted against Defendants St. Vincent Hospital, Praveen Devineni, M.D. and Venababu Kandimalla, M.D.
SO ORDERED.
                                                            -9-
@/s/Robert B. Gordon
Justice of the Superior Court
@February 6, 2024