IAN SHINE, administrator,[1] *vs.* JOSE VEGA & another.[2]

Suffolk. January 8, 1999. - April 29, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Practice, Civil,* Instructions to jury. *Medical Malpractice,* Consent to medical treatment. *Negligence,* Medical malpractice. *Doctor,* Duty to disclose to patient. *Constitutional Law,* Right to refuse medical treatment. *Evidence,* Burden of going forward, Declaration of deceased person.

At the trial of a wrongful death action, the issue of the plaintiff's decedent's consent to certain medical treatment was properly preserved for appellate review. [462-463]

Discussion of cases considering the circumstances in which a competent individual may refuse medical treatment necessary to save that individual's life [463-464] and discussion of the emergency exception to the informed consent doctrine [464-466].

At the trial of a wrongful death action, the judge's erroneous instructions foreclosed the jury's consideration whether the defendant physician took sufficient steps in the circumstances to obtain the plaintiff's decedent's informed consent, or the consent of a family member, before forcibly commencing treatment, and a new trial was required on that claim as well as claims for assault and battery and false imprisonment. [466-467]

At the retrial of a wrongful death action, the judge should make a new determination whether any or all notes written by the plaintiff's decedent concerning her medical treatment are admissible under G. L. c. 233, § 65. [468-469]

CIVIL ACTION commenced in the Superior Court Department on March 19, 1993.

The case was tried before *Margaret R. Hinkle,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael J. Traft* for the plaintiff.

*Joseph P. Musacchio* for the defendants.

MARSHALL, J. In this wrongful death case, we must resolve the conflict between the right of a competent adult to refuse medi-

---

[1]Of the estate of Catherine Shine.

[2]Massachusetts General Hospital.

cal treatment and the interest of a physician in preserving life without fear of liability. In 1990, an invasive procedure, intubation,[3] was forcibly performed on Catherine Shine (Catherine),[4] a life-long asthmatic in the midst of a severe asthma attack. Dr. Jose Vega, an emergency physician at Massachusetts General Hospital (MGH), initiated the intubation without Catherine's consent and over her repeated and vigorous objections. In 1993, Dr. Ian Shine, Catherine's father and the administrator of her estate, brought a multi-count complaint against Dr. Vega and MGH seeking damages for tortious conduct and the wrongful death of his daughter.[5] He alleged that Catherine was traumatized by this painful experience, and that it led to her death two years later. On that occasion, Catherine again suffered a severe asthma attack but refused to go to a hospital because, it was claimed, she had developed an intense fear of hospitals. Her father alleged that Catherine's delay in seeking medical help was a substantial factor in causing her death.

At trial the defendants took the position that, confronted with a life-threatening emergency, Dr. Vega was not required to obtain consent for treatment from either Catherine or her family. A judge in the Superior Court agreed, and charged the jury that no patient has a right to refuse medical treatment in a life-threatening situation. She also instructed that in an emergency the physician need not obtain the consent of the patient or her family to proceed with invasive treatment. A jury returned verdicts for the defendants on all counts. Dr. Shine appeals from the judgment entered on the jury verdicts, and from the denial of his motion for judgment notwithstanding the verdict or a new trial. He contends that the trial judge incorrectly instructed the jury that (1) a patient's right to refuse medical treatment does not apply in an "emergency" medical situation; (2) it is not a battery for a physician to treat a patient without

---

[3]Intubation is a procedure by which a tube is inserted through either the nose or the mouth into the windpipe. The tube enables oxygen to be delivered directly into the lungs, typically by means of a ventilator.

[4]We use Catherine's first name to distinguish her from her sister, Anna Shine (Anna).

[5]Dr. Shine alleged negligence, assault and battery, false imprisonment, intentional infliction of emotional distress, wrongful death, violation of Catherine's civil rights, and violation of the Massachusetts Patient Bill of Rights Act and cognate Federal rights. The complaint also sought damages for tortious conduct against Catherine's sister, Anna Shine. Dr. Shine later voluntarily dismissed all counts of the complaint relating to Anna.

obtaining consent if the treatment is necessary to prevent death or serious bodily harm; and (3) it is not false imprisonment forcibly to restrain a patient in a life-threatening situation. He also challenges the judge's ruling excluding certain notes Catherine made concerning her treatment at MGH. We transferred the case here on our own motion. We conclude that the instructions were erroneous, and that the errors were prejudicial. We vacate the judgment and remand the case to the Superior Court for a new trial.

## I

At approximately 7 A.M. on Sunday, March 18, 1990, twenty-nine year old Catherine Shine arrived at the MGH emergency room seeking medical help for an asthma attack. Catherine had been asthmatic throughout most of her life, a condition she controlled through prescription medication. The daughter of a physician, Catherine had educated herself about her condition and was well informed about her illness. Her asthmatic attacks were characterized by rapid onset, followed by a rapid remission. She had never required intubation in the past.

Earlier that morning, Catherine had suffered a severe asthma attack at her sister Anna's apartment. Despite believing that her condition was improving after using her prescription inhaler, Catherine agreed with Anna's suggestion to go to MGH, but on the condition that she be administered only oxygen. After Anna received assurances from an MGH representative that Catherine would be treated with just oxygen, Catherine entered the MGH emergency department, accompanied by Anna.

Catherine initially was given a nebulizer, a mask placed over her mouth which delivered oxygen and medication. She complained to Anna that the medication was giving her a headache, removed the mask and indicated that she wished to leave the hospital. Catherine's behavior alarmed the nurse who was treating her. An arterial blood gas test, measuring the levels of oxygen and carbon dioxide in her blood, was drawn at approximately 7:15 A.M. The results, obtained at approximately 7:30 A.M., showed that Catherine was "very sick." Dr. Vega, the only emergency room attending physician on staff at MGH that morning, examined Catherine and concluded that she required intubation. Catherine resisted, and Dr. Vega initially agreed to try more conservative treatment with the oxygen mask. Catherine continued to disagree with the medical staff concerning her treatment.

Anna, frustrated by what she felt was a medical staff unwilling to listen to her sister, telephoned their father, Dr. Shine, who was in England. Dr. Shine had treated Catherine when she was a child and was familiar with Catherine's condition. Dr. Shine spoke to an MGH physician and told him[6] that Catherine was intelligent and "very well-informed" about her illness, and he urged the physician to listen to Catherine and to try to obtain her consent for any treatment. Dr. Vega testified that he told Dr. Shine that Catherine was in "the midst of an extremely severe asthma attack," and that he unsuccessfully had tried to avoid intubation. Dr. Vega testified that Dr. Shine asked him to wait until he flew to Boston before intubating Catherine. He also testified that he had made a "conscious decision" not to tell Catherine that her father had opposed intubation.

Anna returned to Catherine's room to find her in a "heated" argument with the MGH staff. Catherine's condition had improved somewhat, and she was able to talk and to breathe more easily. At approximately 7:40 A.M., during a moment when the doctors left Catherine and Anna alone together, Catherine told Anna to "run." They ran down the corridor to the emergency room exit doors, where they were forcibly apprehended by a physician and a security guard. Catherine was "walked back" to her room where Dr. Vega immediately ordered that she be placed in four-point restraints, in part because she had refused treatment and attempted to leave the emergency room.[7] Catherine and Anna were forcibly separated. Dr. Vega initiated the process of having Catherine intubated. At approximately 8 A.M., the results of a second blood gas test became available, showing that Catherine's condition had improved somewhat. Dr. Vega testified that the results, even if he had read them (he had not), would not have changed his decision to intubate Catherine. At approximately 8:25 A.M., the intubation procedure commenced, approximately forty-five minutes after

[6]There was conflicting testimony concerning which MGH physician spoke to Dr. Shine, and whether the conversation occurred before or after Catherine was restrained. Dr. Shine testified that he spoke to an emergency room physician but that he did not believe it was Dr. Vega. Dr. Vega testified that he spoke to Dr. Shine that morning. For purposes of our decision, the conflicts are not material.

[7]Dr. Vega testified that Catherine's patient chart contained the reason for her forcible restraint: "Patient became more confused and combative, refusing treatment and suddenly ran down the hallway and nearly out of the [emergency ward] and brought back."

Catherine had been strapped in four-point restraints. Catherine never consented to this treatment. Dr. Vega testified that he never discussed with Catherine the risks and benefits of intubation. Neither Anna, who was still at the hospital, nor Dr. Shine was asked to consent to the intubation. Catherine was released from MGH the following day.

Catherine's family testified that she was traumatized by these events. She had nightmares, cried constantly, and was unable to return to work for several months. For the first time in her life, they said, she was obsessed about her medication and what she ate. Catherine became suspicious of physicians, and repeatedly "swore" she would never go to a hospital again. In July, 1992, Catherine suffered another severe asthma attack while at home with her fiancé and her brother. She did not want to go to a hospital. After she became unconscious, her brother called an ambulance. Despite two days of medical treatment at South Shore Hospital, she died.

## II

Dr. Shine's central claim both at trial and on appeal is that Dr. Vega and MGH wrongfully restrained and intubated Catherine without her consent.[8] He sought to show that Catherine's mental abilities at the relevant times were not impaired, and that she was not facing a life-threatening emergency when she was restrained and intubated.[9] The defense took the position that Dr. Vega was confronted with a life-threatening emergency,

---

[8]Dr. Vega explained that in his judgment Catherine was too "confused" to give her assent and did not appreciate "the severity of her illness." He testified that he considered Catherine's "combative" behavior, refusal of treatment and attempt to flee as indications of her increasingly confused mental state. The plaintiff offered compelling evidence that Catherine was not incapable of giving her consent and, even if she had been, her family was readily available for consultation.

[9]Expert witnesses for Dr. Shine testified that the intubation procedure was not an appropriate treatment for Catherine, that MGH medical staff failed properly to evaluate Catherine's competency to consent to treatment, and that failure to comply with unwanted treatment does not necessarily indicate lack of competence. The plaintiff's experts also testified that the situation was not an emergency, that Catherine was able to make rational decisions, and that intubation should be used only if absolutely necessary because the patient may develop fear of future intubation. There was also expert testimony that Catherine's treatment at MGH was below the appropriate standard of care because no determination of her competence was made, and that, if she was

and Catherine's consent was not necessary.[10] On appeal they argue that a medical emergency operates as a limitation on the "abstract right" of a patient to refuse treatment, and that in this situation a doctor may override a patient's right to refuse treatment.[11]

The judge instructed the jury that "under Massachusetts law a patient has the right to refuse medical treatment *except* in an emergency, life-threatening situation" (emphasis added). It was therefore up to the jury, she said, to determine whether or not such a situation existed. She repeated that instruction, emphasizing "[o]nce again" that "the law in Massachusetts is that a patient has the right to refuse medical treatment except in an emergency, life-threatening situation." She told the jury that this was not a case of "informed consent" because Catherine's right to refuse to be intubated was "not an absolute right." It is a right constrained by "the right of the state or the obligation of the state to preserve the lives of its citizens . . . a right that exists in an emergency room setting to perform treatment without the consent of the patient," she charged.

The judge repeated this several times. On the element of negligence, she instructed that "[i]f there is a life-threatening circumstance, then the hospital, its employees, and Doctor Vega have the right to treat Catherine Shine without getting her consent or anybody else's consent, *whatever her condition . . . .*" (emphasis added). "In other words," she said, "a physician who . . . has reason to believe that the failure to conduct a procedure such as intubation would create a likelihood of serious harm to the patient by reason of a life-threatening situation

---

incompetent, the treating physician should have but did not seek consent from her family.

[10]Several experts testified on behalf of the defendants that the actions of the MGH staff were appropriate, that if Catherine had been given only oxygen, as she requested, she likely would have died, and that Catherine's treatment at MGH was not the type of experience that could produce posttraumatic stress disorder.

[11]In a nonemergency setting, the right of an incompetent patient to consent to or to refuse medical treatment is protected by a judicial, "substituted-judgment" proceeding. *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489, 504 (1983). The medical best interest of the patient is not the touchstone of a substituted judgment decision. Rather, the determination is " 'that which would be made by the incompetent person, if that person were competent' . . . and giving 'the fullest possible expression to the character and circumstances of that individual.' " *Id.* at 500, quoting *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 747, 752-753 (1977).

may perform that procedure *without the consent of the patient.*"[12]

As to the assault and battery count, she instructed "that a doctor and/or a hospital does not commit an assault and battery when they treat a patient without her consent if the treatment is necessary to save her life or to prevent serious bodily harm." On the charge of false imprisonment, the judge instructed that medical personnel may confine a patient without her consent, "if there is reason to believe that a person in an emergency room is suffering from a life-threatening situation." She repeated that "[i]t is lawful for the hospital and for Doctor Vega to have confined Catherine Shine if she is experiencing a life-threatening emergency. That is justified."

## A

The defendants first argue that Dr. Shine did not adequately preserve his challenge to the jury instructions on the emergency exception to tort liability because he failed to convey to the judge the definition of an "emergency" he espouses on appeal — that there must be a life-threatening situation and the patient must be unconscious or otherwise incapable of giving her consent. We conclude that the issue was not waived: the question whether Catherine's consent was required before intubation was a live issue throughout trial, and was properly preserved. The plaintiff objected to the judge's refusal to instruct the jury on Catherine's competence, and he objected to the defendants' instructions on the emergency exception espoused by the defendants and adopted by the judge. Moreover, the defendants had the burden of proving that an exception relieved them of tort liability. See *Harnish* v. *Children's Hosp. Med. Ctr.*, 387 Mass. 152, 157 (1982) (burden of proving privilege rests with physician), citing *Canterbury* v. *Spence*, 464 F.2d 772, 791 (D.C. Cir.), cert. denied, 409 U.S. 1064 (1972) (defendant bears

---

[12]The judge further instructed:

"[A] doctor, a hospital and its employees are permitted a wide range in the exercise of their professional judgment concerning the treatment to be given a patient as long as the exercise of that professional judgment is in accordance with the duty of care as I have described it to you. Once again, ordinarily a physician must obtain the consent of a patient before treatment. However, in an emergency room situation, a physician may undertake treatment provided that what he does is within the customary practice of physicians practicing his specialty in similar circumstances; and *I have defined an emergency for you as a life-threatening situation or something akin to that.*"

"burden of going forward with evidence pertaining to a privilege" because it is "consistent with judicial policy laying such a burden on the party who seeks shelter from an exception to a general rule and who is more likely to have possession of the facts").[13]

### B

In *Norwood Hosp.* v. *Munoz,* 409 Mass. 116, 121 (1991), we considered in what circumstances a "competent individual may refuse medical treatment which is necessary to save that individual's life." We described in that case both the common law and constitutional bases for our recognition of the "right of a competent individual to refuse medical treatment." *Id.* at 122. See *Brophy* v. *New England Sinai Hosp., Inc.,* 398 Mass. 417, 430 (1986); *Superintendent of Belchertown State Sch.* v. *Saikewicz,* 373 Mass. 728, 739, 742 (1977) (right to refuse medical treatment is rooted in common-law jurisprudence and guaranteed through constitutional right to privacy); *Matter of Spring,* 380 Mass. 629, 634 (1980). We recognized that "[e]very competent adult has a right 'to [forgo] treatment, or even cure, if it entails what for [her] are intolerable consequences or risks however unwise [her] sense of values may be in the eyes of the medical profession.' " *Harnish* v. *Children's Hosp. Med. Ctr., supra* at 154, quoting *Wilkinson* v. *Vesey,* 110 R.I. 606, 624 (1972).

In *Norwood Hosp.* v. *Munoz, supra* at 122-123, we also described how the "right to bodily integrity" had developed through the doctrine of informed consent. See *Harnish* v. *Children's Hosp. Med. Ctr., supra.* Under that doctrine, "a physician has the duty to disclose to a competent adult 'sufficient information to enable the patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure.' " *Norwood Hosp.* v. *Munoz, supra* at 123, quoting *Harnish* v. *Children's Hosp. Med. Ctr., supra* at 154-155. We again stressed that it is "for the individual to decide whether a particular medical treatment is in [her] best interests,"

---

[13]The judge correctly instructed that on the claim of false imprisonment, the defendant "has the burden of proof of establishing that Doctor Vega and [MGH] confined Catherine Shine because their confinement was justified by law." She did not instruct the jury that the defendants had the burden to prove that they were relieved of their obligation to obtain Catherine's informed consent before they restrained her or proceeded with the intubation.

"whether that decision is wise or unwise," and that a patient's right to refuse medical treatment, after having been informed by her physician of the risks involved, is not undermined because the treatment involves "life-saving procedures." *Norwood Hosp.* v. *Munoz, supra,* quoting *Lane* v. *Candura,* 6 Mass. App. Ct. 377, 383 (1978).[14]

Dr. Vega and MGH concede that Catherine exercised her right to refuse medical treatment and never consented to intubation. But, they argue, Dr. Vega could override Catherine's wishes as long as he acted "appropriately and consistent with the standard of accepted medical practice" and "to save and preserve her life in an emergency situation." It was not necessary, they argue, to instruct the jury on a competent patient's right to refuse medical treatment because it was, in their words, "largely irrelevant" to the critical liability question — whether Catherine faced a life-threatening situation.

The emergency exception to the informed consent doctrine has been widely recognized and its component elements broadly described. See, e.g., W.L. Prosser & W.P. Keeton, Torts § 18, at 117-118 (5th ed. 1984)[15]; Meisel, The "Exceptions" to the Informed Consent Doctrine: Striking a Balance Between Competing Values in Medical Decisionmaking, 1979 Wis. L. Rev. 413, 430-438. See also Restatement (Second) of Torts § 892D (1979) (emergency action without consent). In *Matter of Spring,* 380 Mass. 629, 634 (1980), we held that "a competent person has a general right to refuse medical treatment in appropriate circumstances, to be determined by balanc-

---

[14]In *Norwood Hosp.* v. *Munoz,* 409 Mass. 116, 127 n.6 (1991), we cited with approval the holding of the New Jersey Supreme Court that, "[i]f the patient rejected the doctor's advice, the onus of that decision would rest on the patient, not the doctor. Indeed if the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole." (Citations omitted.) *Id.,* quoting *Matter of Conroy,* 98 N.J. 321, 352-353 (1985).

[15]The requirements of the exception or privilege are:

"(a) the patient must be unconscious or without capacity to make a decision, while no one legally authorized to act as agent for the patient is available; (b) time must be of the essence, in the sense that it must reasonably appear that delay until such time as an effective consent could be obtained would subject the patient to a risk of a serious bodily injury or death which prompt action would avoid; and [c] under the circumstances, a reasonable person would consent, and the probabilities are that the patient would consent." W.L. Prosser & W.P. Keeton, Torts § 18, at 117 (5th ed. 1984).

ing the individual interest against countervailing State interests, particularly the State interest in the preservation of life."[16] We went on to say that "[u]nless there is an emergency or an overriding State interest, medical treatment of a competent patient without his consent is said to be a battery." *Id.* at 638. We did not elaborate on the requirements of the emergency exception to the informed consent doctrine because that issue was not presented. In *Canterbury* v. *Spence*, 464 F.2d 772 (D.C. Cir. 1972), a seminal case, the court explained that the emergency exception[17]

"comes into play when the patient is unconscious or otherwise incapable of consenting, and harm from a failure to treat is imminent and outweighs any harm threatened by the proposed treatment. When a genuine emergency of that sort arises, it is settled that the impracticality of conferring with the patient dispenses with need for it. Even in situations of that character the physician should, as current law requires, attempt to secure a relative's consent if possible. But if time is too short to accommodate discussion, obviously the physician should proceed with the treatment."

*Id.* at 788-789. See Restatement (Second) of Torts § 892D (a) (1979) ("emergency makes it necessary or apparently necessary, in order to prevent harm to the other, to act before there is opportunity to obtain consent from the other or one empowered to consent for him"). Consistent with other courts that have considered the issue, we recognize that the emergency-treatment exception cannot entirely subsume a patient's fundamental right to refuse medical treatment. The privilege does not and cannot override the refusal of treatment by a patient who is capable of providing consent. If the patient is competent, an emergency physician must obtain her consent before providing treatment, even if the physician is persuaded that, without the treatment, the patient's life is threatened. See *Norwood Hosp.* v. *Munoz*, *supra* at 130-131; *Miller* v. *Rhode Island Hosp.*, 625 A.2d 778,

---

[16]We later rejected a claim that the State's interest in the "preservation of life," including cases where the "patient's affliction is curable," overrides the individual decision of a competent adult to refuse medical treatment. *Norwood Hosp.* v. *Munoz, supra* at 125.

[17]The exception is sometimes referred to as a "privilege" for physicians to act without the consent of their patients. See, e.g., W.L. Prosser & W.P. Keeton, *supra* at § 18, at 117-118.

784 (R.I. 1993) ("physician must respect the refusal of treatment by a patient who is capable of providing consent, even in an emergency"). If the patient's consent cannot be obtained because the patient is unconscious or otherwise incapable of consenting, the emergency physician should seek the consent of a family member if time and circumstances permit. See Restatement (Second) of Torts § 892D comment a (1979) ("privilege must necessarily be a limited one and can arise only . . . when there is no time to consult the other or one empowered to consent for him, or for reasons such as the unconsciousness of the other, his consent cannot be obtained"). See also *Miller* v. *Rhode Island Hosp.*, *supra* at 784 ("[u]nder the emergency exception a medical-care provider should seek the consent of the patient or, if the patient is incapable of providing consent, the consent of a family member before administering treatment"), citing *Canterbury* v. *Spence, supra* at 789; *Rodriguez* v. *Pino*, 634 So. 2d 681, 687 (Fla. Dist. Ct. App. 1994) (defining emergency as situation which "calls for immediate medical treatment and *it is not feasible to obtain consent from one legally permitted to provide it*" [emphasis in original]), citing *Chambers* v. *Nottebaum*, 96 So. 2d 716, 718 (Fla. Dist. Ct. App. 1957). If, and only if, the patient is unconscious or otherwise incapable of giving consent, and either time or circumstances do not permit the physician to obtain the consent of a family member, may the physician presume that the patient, if competent, would consent to life-saving medical treatment.[18] See *Matter of Spring*, 8 Mass. App. Ct. 831, 836 n.5 (1979), *S.C.*, 380 Mass. 629 (1980). The "impracticality of conferring" with the patient or her family, *Canterbury* v. *Spence, supra* at 788-789, is an essential aspect of the emergency exception to the requirement that a physician obtain a patient's informed consent before proceeding with treatment. We are aware of no other court that has sanctioned the sweeping emergency privilege the defendants advocated here.

In the often chaotic setting of an emergency room, physicians

---

[18]The Restatement (Second) of Torts § 892D (b) (1979) provides, in addition, a substituted judgment component of the privilege. Liability will not attach if "the actor has no reason to believe that the other, if he had the opportunity to consent, would decline." The comment to the section further explicates that, "[i]f the actor knows or has reason to know, because of past refusals or other circumstances, that the consent would not be given, he is not privileged to act."

and medical staff frequently must make split-second, life-saving decisions. Emergency medical personnel may not have the time necessary to obtain the consent of a family member when a patient is incapable of consenting without jeopardizing the well-being of the patient. But a competent patient's refusal to consent to medical treatment cannot be overridden because the patient faces a life-threatening situation.[19]

To determine whether an "emergency" existed sufficient to insulate Dr. Vega and MGH from all tort liability, the jury should have been required to decide whether Catherine was capable of consenting to treatment,[20] and, if not, whether the consent of a family member could have been obtained. It is up to the jury to determine whether the treating physician took sufficient steps, given all of the circumstances, to obtain either the patient's informed consent, or the consent of a family member. See *Miller* v. *Rhode Island Hosp.*, *supra* at 787 ("[u]nder the emergency exception to informed consent it is within the domain of the jury to engage in factfinding concerning the existence of an emergency and a patient's competence to consent"). In this case the judge's charge foreclosed the jury from making those necessary determinations. The instructions were repeated several times by the judge. She asked the jury to consider first whether Catherine's life was threatened. If the jury answered that question affirmatively, the jury, in essence, were instructed to go no further. The jury instructions concerning assault and battery and false imprisonment were erroneous for the same reason: they were premised on the theory that, despite Catherine's refusal of treatment, the defendants were absolved of all liability if the jury determined that Catherine faced a life-threatening situation. On this record, there is no basis on which to conclude that the error was not prejudicial. A new trial is required.

---

[19]In *Norwood Hosp.* v. *Munoz, supra* at 127, we said that the State's interest in maintaining the ethical integrity of the profession does not outweigh the patient's right to refuse unwanted medical treatment: "[T]he ethical integrity of the profession is not threatened by allowing competent patients to decide for themselves whether a particular medical treatment is in their best interests." *Id.*, citing *Matter of Conroy, supra* at 352.

[20]A physician, and a jury, may reasonably take into account a patient's refusal to consent to life-saving medical treatment in determining whether the patient is competent to consent to or refuse treatment, but this factor is not dispositive. See *Lane* v. *Candura*, 6 Mass. App. Ct. 377, 383 (1978) (patient's refusal to consent to life-saving amputation in itself was not sufficient to render her legally incompetent for purposes of appointing guardian).

## III

Both parties moved in limine for a ruling on the admissibility of notes Catherine wrote about her experience at MGH. The judge made a preliminary ruling to exclude portions of Catherine's notes that characterized certain events, and she later ruled that the remaining notes were inadmissible. Dr. Shine challenges those rulings. We address the issue because it is likely to arise at retrial.

General Laws c. 233, § 65, provides that "a declaration of a deceased person shall not be inadmissible in evidence as hearsay . . . if the court finds that it was made in good faith and upon the personal knowledge of the declarant." The judge gave three reasons for excluding Catherine's notes: (1) uncertainty as to when they were created; (2) late disclosure of some of the notes; and (3) indications that they were made in anticipation of litigation. At retrial, the late disclosure of the notes will no longer be relevant. We comment on the other two reasons. The judge appeared to give the greatest weight to her finding that the notes were written in anticipation of litigation.[21] That a writing or statement is made in anticipation of litigation, or in preparation for a meeting with an attorney, does not necessarily mean that it is not made in "good faith." General Laws c. 233, § 65, has been "liberally construed as remedial legislation designed to mitigate under proper safeguards the hardship often resulting from the loss of evidence by reason of death." *Berwin* v. *Levenson*, 311 Mass. 239, 242 (1942). When first enacted, the statute allowed for the admission of a statement only if it was made "before the beginning of the suit." St. 1898, c. 535. In 1943, the statute was rewritten to remove that requirement, permitting in evidence statements by deceased persons made even after litigation began. St. 1943, c. 232, § 1. If, under the amended statute, statements made after litigation has commenced are admissible, it cannot be that a statement made in anticipation of litigation is inherently not made in good faith.

---

[21]The notes, for example, contained names of attorneys and a telephone number, and questions: "Could he represent me? Or suggest the best representation?" The notes also stated, "I want to try and establish a way to assure that this doesn't happen to other people — like [M]iranda rights — a formal procedure whereby doctors must gain consent and can't misuse power." When asked by the judge for evidence that the notes were not made in anticipation of litigation, plaintiff's counsel responded, "I don't think we have any affirmative evidence."

Notes made in preparation for consulting an attorney are also not necessarily inadmissible. A person consulting an attorney may have the most compelling reasons to be honest: to permit an informed assessment of the strength of her possible legal claim. If the deceased person had an understanding of the attorney-client privilege, that might also bear on whether a statement is truthful (made in good faith), for the privilege protecting communications with an attorney exists to encourage honest communications between a person and her attorney. See *Upjohn Co.* v. *United States*, 449 U.S. 383, 389 (1981) (purpose of privilege "to encourage full and frank communication between attorneys and their clients"). See also Mass. R. Prof. C. 1.6 comment [2], 426 Mass. 1301, 1322 (1998) (confidentiality "facilitates the full development of facts essential to proper representation").

As to the remaining reason given by the judge — the uncertainty as to the date of the notes — we cannot discern from this record why the date of creation necessarily is relevant. We have no indication that, whenever Catherine created the notes, she had any hint that she would not be alive if, and when, litigation commenced. The circumstances of her death suggest the contrary. It does not appear that Catherine created the notes with "an incentive to avoid blame," *Barbosa* v. *Hopper Feeds, Inc.*, 404 Mass. 610, 620 (1989), nor for the "specific purpose of making [them] available for use at a possible trial" or for "perpetuating the declarant's testimony," *Anselmo* v. *Reback*, 400 Mass. 865, 868, 869 (1987). At the retrial, the judge will need to make her own determination whether any or all of the notes are admissible. On this record we cannot make that judgment as a matter of law.

## IV

The judgment is vacated and the case is remanded to the Superior Court for a new trial.

*So ordered.*